## PEOPLE v. SANDERS.[*]

### Crim. No. 95; September 15, 1896.

#### 46 Pac. 153.

**Criminal Law—Continuance.**—Where a Year Elapsed Between the indictment of a defendant and his trial, during which both prosecution and defense searched without success for persons who were material witnesses, the court was justified in refusing a further continuance on the ground of their absence.

**Forgery—Evidence.**—In a Trial of a Defendant charged with having forged and uttered a draft, evidence that the person whose name purported to be signed to such draft had, prior to its date, been murdered by defendant, is pertinent and material, both as tending to prove that the instrument was forged, and also the knowledge of its false character by defendant when he uttered it; and it is not rendered inadmissible by the fact that it tends to prove the commission by defendant of a separate crime.

**Criminal Trial—Argument of Counsel.**—Where Evidence is Properly admitted in a criminal trial, though it tends to prove the defendant guilty of another crime than the one charged against him, counsel for the prosecution has the right to discuss such evidence to the jury, and to argue any theory which may legitimately be deduced therefrom.

**Criminal Trial—Evidence.**—Where the Prosecution, to prove as a fact material to the issue that a certain person had been murdered by defendant, was permitted to introduce evidence tending to show that such person was seen riding with defendant, and that at a point farther along the road defendant was riding alone, it was prejudicial error to exclude the testimony of a witness offered by defendant to the effect that at a point still farther along the road the witness met the defendant and another riding with him, and tending to show that such other was the person claimed to have been murdered.

**Criminal Trial.—Testimony of Witnesses Shown to have Been** in the vicinity that they did not see a vehicle claimed by defendant to have passed along a certain road is admissible, its weight being for the jury to determine.

**Criminal Trial—Evidence.**—Where the Existence of a Certain Person in regard to whom a defendant has testified is questioned by the prosecution, it may introduce testimony in rebuttal showing that efforts have been made by the officers to learn of the existence or whereabouts of such person, and that they were unsuccessful.

[*]Rehearing denied.

Criminal Trial—Evidence—Genuineness of Letter.—The fact that witnesses have testified that, in their opinion, a letter offered in evidence by a defendant is genuine, while there is no direct testimony in rebuttal, does not require the court to instruct the jury that they must consider the letter as genuine, where the evidence of the prosecution tends to establish other facts which disprove its genuineness.

Forgery.—Where the Prosecution Claimed That Certain Instruments executed before the defendant as a notary were forged and fictitious, while defendant testified to their genuineness, the refusal of the court to instruct as to the presumption of genuineness arising from the defendant's certificate as notary was not erroneous, as such presumption added nothing to the positive testimony of defendant, or to the presumption of his innocence, which cast the burden of proof on the prosecution.

Forgery.—In a Prosecution for Uttering a Forged Draft, where the prosecution had introduced evidence tending to show that the purported drawer had been murdered by defendant previous to the time when the draft was written and uttered, it was proper to refuse to instruct the jury that they should not presume the death of such person, as a circumstance tending to show defendant's guilt, unless such death and defendant's knowledge of it were proven beyond a reasonable doubt, defendant's guilt not being necessarily dependent on such fact, and the jury being entitled to consider the evidence in relation to it in connection with the other evidence, though they might not regard it as established beyond a reasonable doubt.

Criminal Trial—Conduct of District Attorney.—It is Improper for a prosecuting attorney to comment in argument on the failure of a defendant to testify upon any particular point.

APPEAL from Superior Court, Fresno County; J. R. Webb, Judge.

W. A. Sanders was convicted of forging and uttering a draft, and appeals. Reversed.

Frank H. Short and F. E. Cook for appellant; Attorney General Fitzgerald for the people.

HENSHAW, J.—W. A. Sanders was indicted for forging the name of William Wootton in a draft upon the Kutner-Goldstein Company for the sum of $1,400, payable to the order of said Sanders, and for uttering and passing the said draft, knowing the same to be false and forged. From the judgment of conviction and from the order denying him a new trial he prosecutes these appeals.

The story, as told by the evidence in this case, is extraordinary, and in some respects without parallel. The defendant is a man nearly sixty years of age, who has resided in this state for more than half of his lifetime. For many years he was prominent in educational circles. He had been a teacher in the public schools in different parts of the state. He was well educated, and possessed of much learning, and more than local reputation as an agriculturist, horticulturist and botanist. He was married, and the father of children, who were growing up about him in his home in Fresno county, where he had resided for many years, and where he seems to have enjoyed, up to the time of these transactions, the universal regard and respect of his fellow-men. Wootton was an old man, past seventy years of age, possessed of valuable farming lands lying near the home of Sanders. Wootton was unmarried, and lived upon his land alone, saving for the presence of Charles Rohloff, who was employed as a farm hand. Sanders and Wootton were friends. For some time prior to the date of these occurrences, Sanders represented to Wootton and to others that one John Knausch had in contemplation the purchase of the Wootton land, designing to devote so much of it as was practicable to the culture of citrus fruits. Acting, as he represented, for Knausch, who was in San Francisco or elsewhere, Sanders made an examination of the Wootton land, platted it, showing its sources of water supply, fences and other improvements, describing the nature of its soil; in short, collating such information as a purchaser unfamiliar with the property would naturally desire to possess. This information he sent by letter to Knausch. Wootton was reluctant to sell, or at least reluctant to sell for any price which Knausch was willing to give. Sanders, by letter, suggested to Knausch that, when he should come to bargain in person with Wootton for the property, it would be well for him to bring $20,000 in gold coin, the sight of which would tend to excite old Wootton, to stimulate his desire to sell, and enable Knausch to secure a better bargain. Knausch being unfamiliar with the Wootton land, Sanders also suggested to him that, when he came, he should not drive directly to the Wootton house, but should drive up a valley to the rear of Wootton's house, and, leaving his vehicle there, cross the steep, high hill which interposed between the valley and Wootton's home; that, by this mode of approach, he would

be enabled to take from the top of the hill a comprehensive view of the Wootton property, and thus save much time which would otherwise be spent in travel and inspection.

The matter of these transactions was in agitation for over a year. Upon the first day of February, 1894, Sanders was at Wootton's house, whither he had driven, as he says, to await the coming of Knausch, whom he was daily expecting. The hour for the noonday meal had arrived. Rohloff, the farm hand, came in from the field. The noonday meal was eaten, and Rohloff went back to his work, which was that of sowing grain, Sanders agreeing that when he should leave for home, as he proposed to do later in the afternoon, he would bring out to him upon his buckboard some sacks of seed grain. After Rohloff had gone, and when Sanders and Wootton were alone in Wootton's house, John Knausch appeared, accompanied by a man named Graves, the two having crossed on foot by the trail over the hill to the rear of Wootton's house, Knausch carrying with him a stout valise containing $20,000 in gold coin, which would weigh about seventy-three pounds. The subject of the purchase and sale of the Wootton ranch was speedily broached. There was haggling over the terms and price, when Knausch opened his valise, and began to pour the gold upon the table. Wootton became much interested, told Knausch to keep on piling up the gold, that the table could stand it, and, with visible excitement, exclaimed, "We can trade!" The terms of the transaction were then and there agreed upon. Some papers relating to it had been brought by Knausch in anticipation of effectuating the bargain. Others were prepared upon the spot. The result was that Wootton deeded all of his property to Knausch. Knausch would have nothing to do with any of the land saving that which was fit for citrus culture, and, by an arrangement between him and Sanders, such part of the land as was unsuitable for that purpose was to be conveyed to Sanders, while Sanders, in exchange, was to convey land of his own suitable for such purposes. In addition, there was drawn up and signed by the parties a long agreement, under which the lands were to be planted with citrus-bearing trees, under the direction and management of Sanders, who was to receive a salary for his services as superintendent. Knausch was to tunnel the hills for water for irrigating purposes, and, being a practical miner, was to have charge of that work. The expenses

were to be borne equally by the four, saving that Knausch was to lend to Sanders, if necessary, moneys with which Sanders was to furnish his share of the expense. This land was to be deeded to a son of Sanders, because the son was a minor, and was to be redeeded by him to the individual owners, upon demand, after he had attained his majority. Sanders was a notary public. The acknowledgments to each and all of these papers which could have been acknowledged before him were taken before Sanders. In the matter of the deed from Knausch to Sanders, and of Sanders' deed in exchange to Knausch, because Sanders could not acknowledge a deed to himself or from himself, the plan of an intermediary dummy was suggested and adopted. Knausch deeded to one Abbott, a young man of the neighborhood, Sanders taking the acknowledgment to this deed; and he afterward, and upon Sanders' representations and explanations, deeded the same land to Sanders. Wootton took the $20,000 in gold. For the remaining part of the purchase price, Knausch offered Wootton a check for $25,000. Wootton refused the check, and it was understood that he should accompany Knausch and Graves either to Fresno or to Los Angeles, where the rest of the money would be paid him. The papers were left with Sanders, with directions from all the parties that, if he heard nothing from them to the contrary in the course of a few days, he was to place them on record, which in fact he did. Wootton, dazzled with the sight of the money, and exercised over the transactions of the day, showed an ever-increasing excitement, until he acted, as Sanders said, like a man dazed or in his sleep. Knausch and Graves left the house, walking back over the hill by the trail to the valley where they had left their vehicle, with the understanding that they should drive down the valley to the county road leading to Fresno, while Sanders and Wootton should proceed down the road from Wootton's house until they overtook them, when the four were to make the rest of the journey to Fresno together. Sanders harnessed his mules to his buckboard, loaded the seed grain for Rohloff, and drove down the road, accompanied by Wootton. The money was in a valise at Wootton's feet. The farm hand, Rohloff, had used up his seed grain, and was looking to see whether Sanders was coming with more, when he noticed the buckboard and its two occupants driving hurriedly down the road. When it reached the spot where San-

ders was to unload the grain, it was stopped, and, according to the testimony of Rohloff, Sanders climbed over the seat of the buckboard, holding the reins in his hand, and without dismounting from the vehicle, kicked and thrust the grain off upon the ground, some of the sacks striking a barbed-wire fence, which tore them open, and scattered their contents. The buckboard was then driven hurriedly on by Sanders to a gate, which was closed. Here Sanders dismounted, opened the gate, came back, took the reins, which he had placed upon the seat, and, holding the reins as he stood upon the ground, drove through, closed the gate, climbed into the buckboard, and drove off. Rohloff was some distance from the road, but noticed that Wootton, whose habit it was never to leave the ranch without instructing the hired man what to do in his absence, and informing him of the date of his return, upon this occasion sat with his hands in his lap, seemingly staring straight ahead. Sanders testifies that Wootton, in his nervousness and anxiety to get away, said that he did not want to see or speak to anybody, and urged Sanders to hurry up; that the mules were restive, having been without exercise for some days, and took a rapid pace of their own accord. He denies, however, that he drove through the gate, saying that Wootton took the lines himself, and drove through. A mile and a half below the point where the two were thus seen by Rohloff, two men, Wiseman and Record, plowing near the county road, saw Sanders, and recognized him, and testified that he was driving alone. This Sanders denies, insisting that, at the time, Wootton accompanied him. Some miles farther on, Sanders was again seen by an acquaintance, Gobin, who testifies that, when he passed him, Sanders was driving alone. This is admitted by Sanders in his testimony, and explained as follows: He said that he drove on with Wootton until they overtook Knausch and Graves; that Wootton, in his nervousness, became exercised over the way in which Knausch was driving the buggy, fearing a breakdown, which would prevent their arrival at Fresno, and insisted upon getting out of Sanders' buckboard, and into Knausch's vehicle, to drive for them. This he did. It was while he was so driving in Knausch's buggy that Sanders, pursuing the journey upon another road, was met and passed by the acquaintance who testified to seeing him alone. Thereafter Wootton returned to Sanders' buckboard, and road with him. While so

riding with him, Sanders, who was much elated at the outcome of the day's work, and at the prospect of receiving $500 commission for effecting the sale, indulged in some jocose remarks to Wootton, such as, "Another milestone is passed, and your money is safe." These remarks roused the old man to great indignation. He declined to travel farther with Sanders, and insisted upon dismounting, and getting into the vehicle with Knausch and Graves. This he did, carrying the gold with him. Sanders, realizing from the old man's indignation that it was idle for him to continue the proposed journey to Fresno with them, turned off to his home. This is the last, so far as the evidence goes, that was ever seen of Wootton, even according to the testimony of Sanders. The last statement, however, is to be taken with this reservation: A witness testifies that he saw Wootton in San Francisco on or about the 10th of February, 1894. He is certain that it was Wootton, but not certain of the date.

Of Graves, Sanders himself could tell little, and no one else anything at all. He was a friend of Knausch, whom Sanders had casually met two or three times before. Upon one occasion he recognized Knausch in San Francisco, followed him into a church, and sat in the pew adjoining that occupied by Knausch and his companion, whom he afterward knew as Graves. The only thing that he remembered was that Graves upon that occasion "made a splendid, good prayer." Concerning Knausch the evidence is much fuller, though not much more satisfactory. Sanders had known him for many years. He had "grub-staked" him in the early days, when Knausch was a miner, and Sanders a school teacher. He had lost track of him until some years before, when Knausch appeared in the section of the county where Sanders resided. He was a tall, dark man, and wore an enormous mustache. Knausch informed Sanders that he had made a good deal of money, and was looking about for an investment in fruit lands. He was with Knausch once in San Diego, and spent the night with him in his room. Upon the occasion of this trip they inspected citrus lands. Knausch was solitary, retiring in deportment, a recluse by habit; seldom, if ever, stopped at hotels; had no fixed abiding place of which Sanders knew; wrote him occasionally, rarely or never directing where the replies should be addressed. Knausch was in the neighborhood of Sanders' home upon one

occasion, but would not visit his home, because he had met a woman in Oregon who had formerly worked for defendant, and this woman said that defendant's wife had given him "such a setting out it made him chill." For this reason he never wanted to see defendant's wife, and would not therefore go to defendant's house. One George Sargent testified that in 1884 or 1885 he was introduced to John Knausch by Sanders. The credibility of Sargent's evidence is impeached by the testimony of witnesses who testified that he is unworthy of belief. A. G. Sanders, son of the defendant, seventeen years of age, testified that he had seen John Knausch while his mother was east, five, six or seven years before. There is no other or further evidence of the existence or whereabouts of Knausch or of Graves, saving the testimony of Sanders, to the effect that after these occurrences, and in pursuance of a letter which he had received from Knausch, he went to Mojave, to meet Knausch, Graves and Wootton. He found neither Knausch nor Wootton, but only Graves, who represented to him that Knausch and Wootton were in the country, looking at mining property. Graves urged him to go with him and join them, but there was an undefinable something about Graves, a suspicious air and bearing, which caused Sanders to mistrust him, without defining why; and, in consequence, Sanders refused to go, and took the next train home. Letters, however, were received by Sanders and others through the United States mail, purporting to come from and to be written by Wootton. The genuineness of these is claimed by the defendant, and disputed by the prosecution.

It was not disputed that Sanders presented and obtained money upon the draft, it being claimed by Sanders that the draft was an inclosure in a registered letter received by him from Wootton, which letter was mailed at San Fernando; that he believed it to be the genuine writing of Wootton, and had no cause or reason to believe otherwise. The expert evidence is, as usual, conflicting; the witnesses for the prosecution testifying that the writing of the draft was not the handwriting of Wootton; others, for the defense, testifying to their belief in its genuineness. It was proved that the letter was, in fact, mailed at San Fernando, but by whom is not established.

The theory and argument of the prosecution is that Knausch and Graves were myths; that Wootton was done to death

Sanders upon the first day of February, and his body concealed; that each and all of these acts were part of a preconceived and elaborately executed design to obtain the property, real and personal, of William Wootton. On the 19th of May, 1894, this indictment was presented against the defendant. On May 21, 1894, the defendant was arraigned. Upon March 9, 1895, defendant moved for a postponement and continuance of the trial, upon the ground of the absence of material witnesses, Knausch, Wootton and Graves. On April 8, 1895, the trial was actually commenced. There had thus elapsed between the date of the indictment and the date of the trial nearly one year, all of which time was available to defendant to procure the attendance of these witnesses. Their importance was known to the defendant and to his counsel. It appears also that the prosecuting officers during this time were making diligent search for them. The failure of both sides thus to learn the whereabouts of these witnesses, and to procure their attendance, gave reasonable cause to believe that no further postponement would secure their attendance, and the court was justified in refusing a continuance.

The draft in question was dated Los Angeles, February 5, 1894. Evidence was introduced by the prosecution, over the objection and exception of the defendant, tending to show that William Wootton, upon February 5, 1894, was dead; that upon the first day of February, 1894, he had been murdered by the defendant, Sanders. The point most strongly urged by appellant is that the court erred in admitting this evidence, in that it was evidence of a separate and distinct crime from the one charged in the indictment, and that a defendant may be charged with but one crime in a single indictment, and tried for but one offense thereunder. An indictment, it is true, must charge but one offense; and, generally speaking, evidence of a separate and distinct offense is not admissible in proof of the one charged. Thus, it will not be permitted generally to prove that a defendant committed some other, independent and distinct crime from the one charged, as the basis of inference and argument that he may have committed the particular one for which he is on trial; for, first, the defendant shall be charged with and tried for but one crime under a single indictment; second, he may and probably will be unprepared to meet with evidence the offense undisclosed the pleadings; and, third, there being no logical connec-

tion between the two offenses, the first does not tend to elucidate or prove any material fact connected with the second, and does tend strongly to distract the minds of the jury from the issue which they are called upon to decide, and to subject the defendant to unjust suspicion and discredit: People v. Jones, 32 Cal. 80. But so far the rule goes, and no farther. Carefully as the law guards the rights of a defend-ant charged with crime, to see that he is not exposed to un-warranted aspersion or attack, it does not extend that care into indulgence. A defendant in a criminal case is treated with fairness, but not with favor. If the evidence of another crime is necessary or pertinent to the proof of the one charged, the law will not thwart justice by excluding that evidence, simply because it involves the commission of another crime: People v. Tucker, 104 Cal. 440, 38 Pac. 195. The general tests of the admissibility of evidence in a criminal case are: First, Is it a part of the res gestae? Second. If not, does it tend logically, naturally and by reasonable inference to estab-lish any fact material for the people, or to overcome any material matter sought to be proved by the defense? If it does, then it is admissible, whether it embraces the commis-sion of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not. The commonest instance of the admission of evidence of another crime is where it becomes pertinent to prove the scienter or guilty knowledge under the particular charge. Thus, where a man is charged with passing counterfeit coin, it is allowable, in order to prove his knowledge that the coin was counterfeit, to show that upon other occasions, with knowledge of the false character of the money, he has passed similar coins. In People v. Cunningham, 66 Cal. 668, 4 Pac. 1144, and 6 Pac. 700, 846, in the prosecution of the defendant for the larceny of cattle, to rebut the presumption that the defendant came innocently into the possession of the cattle, it was permitted to be shown that a steer belonging to a third person, which was found in the defendant's possession with the cattle of the complaining witness, was stolen. In People v. Lane, 101 Cal. 514, 36 Pac. 16, where the charge was murder, the defense pleaded insanity, claiming that the de-flowering of defendant's daughter by deceased had upset his reason. The people, in rebuttal, were permitted to show that the defendant had committed incest with that very daughter,

as combating the view that deceased's acts could have deranged defendant's mind.

In the case at bar it was incumbent upon the prosecution to show that the instrument purporting to be executed by William Wootton was in fact a forgery. One mode by which they undertook to establish this was by evidence that Wootton was dead before the day upon which the instrument bore date. True, this would not conclusively establish the false character of the draft, for a man might postdate such an instrument. Nevertheless, it would be evidence tending to show its false character. Again, it was a proper part of the case of the prosecution to show that the defendant uttered and passed the instrument knowing it to be forged; and if the prosecution could establish to the satisfaction of the jury that Wootton had died before the day upon which the instrument bore date, and that Sanders knew of his death, it would, unquestionably, be strong evidence tending to show that he knowingly passed a forged instrument. But the prosecution, having the undoubted right to prove these things, was not to be deprived of that right merely because the proving of the death involved evidence of the crime of murder against the defendant. The prosecution, in proving the death of Wootton, was entitled to show the manner of his death; and if, in so showing, it was made to appear that he had been foully dealt with, and had come to his end at the hands of the defendant, it was not for that reason to be excluded from the consideration of the jury. The evidence was thus not introduced to besmirch the defendant, or cast unwarranted suspicion upon him. It was necessarily introduced in proof of a material fact, which it was competent for the prosecution to show.

As to the argument of the counsel for the people, of which appellant bitterly complains, it need but be said that, with the evidence properly before the court and the jury, the prosecution was entitled to base thereon any reasonable argument or theory within the legitimate purview of that evidence, being controlled therein by the sound discretion of the court.

For the reasons we have already discussed the evidence of Rohloff, Wiseman, Record and Gobin, tending to show that on and prior to the fifth day of February, 1894, Wootton was dead, was admissible, even though it also tended to show that he was murdered by Sanders.

It will be remembered that in explanation of the fact that, at the time he was seen by the witness Gobin, he was driving alone, Sanders, in his narration of the events of the day, declares that during that portion of the journey Wootton had left the buckboard, and was riding with Knausch and Graves, over a different road. He further explains that the four met again near the town of Reedley; that Wootton once more took his place in Sanders' buckboard, and the two vehicles and their occupants proceeded along the road together. Defendant sought to introduce the evidence of a witness, Wesley Traver, an acquaintance of defendant, to prove that there and at that time Traver saw Sanders, and was able to identify him and his conveyance; to prove further that he saw another vehicle in company with that of Sanders, and that each of these vehicles contained two men; to prove by general description, if not by exact identification, that the man riding with Sanders was William Wootton; to show the time when the meeting took place, the direction in which the men were traveling; and to afford something of a description of the other two men. Under the circumstances, and under the nature of the evidence which had been brought to bear against Sanders, he should have been allowed the fullest latitude in the matter. The court, however, under objections from the prosecution, refused to admit the evidence of the witness Traver, and left such fragments of it as were admitted in an eviscerated and well-nigh unintelligible condition. Only by setting out in detail the record of the case, disclosing the futile efforts of the defense to present to the jury the evidence of this witness, could the hardship and injury which were worked to the defendant be adequately shown. The following, however, will serve as an example: The witness, having been allowed to testify that he did see Mr. Sanders, is asked: "Q. Who did you first see, Mr. Sanders or the others? Mr. Snow: We object to that as incompetent. Mr. Hinds: Irrelevant for any purpose whatsoever. Mr. Short: Q. What way were they going when you saw them? Mr. Hinds: We object on the ground it is incompetent and irrelevant for any purpose. The Court: Same ruling. Mr. Short: Q. What position were the men in when you saw them—the three men you have described? Mr. Hinds: We object on the ground it is incompetent and irrelevant for any purpose. The Court: Let the objection be sustained." Considering

the claim of the prosecution that in the mile and a half of road which lay between the place where Rohloff saw Wootton and Sanders driving together, and the place where Wiseman and Record, plowing in the field, saw Sanders driving alone, Wootton and all trace of him had disappeared as completely as though he had been whirled to another sphere, the importance to the defendant, Sanders, of evidence, even the slightest, showing or tending to show that after that time Wootton was seen in his company, and in the company presumably of the two men whom the prosecution claims to be myths, is manifest; and no discussion is needed to show the injury which the rulings worked. The language of this court in People v. Myers, 70 Cal. 582, 12 Pac. 719, in reviewing similar rulings of the trial court, may here be appropriately employed: "In other words, if needed in order to more clearly present the ruling: If the evidence offered would tend to show the guilt of the defendants, it was admissible; but, if to show their innocence, it was inadmissible."

Prior Nance and his wife lived in the valley up which Sanders testified that Knausch and Graves drove upon the 1st of February, and in which they tied their team when they crossed on foot over the hills to Wootton's home. Nance and his wife were allowed to testify that they saw no vehicle or men there upon that day. The evidence was admissible. The weight of it was for the jury.

In rebuttal and in disproof of the testimony of Sanders as to the existence and whereabouts of Knausch, the prosecution called as a witness J. Scott, the sheriff of the county, and proved by him that he had made search and inquiry as to the existence and whereabouts of the said Knausch. He testified that he had written letters to people in different parts of the state where Sanders had at one time or another located Knausch; that he wrote to the hotels, livery-stables and prominent men in the southern part of the state; made a trip to Los Angeles and San Bernardino; made a thorough search: "wrote north and to every locality I have heard of his being"; that within the county of Fresno he had inquired of all the old citizens, and at every hotel, livery-stable and railroad ticket office; that he had carried on these investigations all over the state for something over a year; and that during the whole time he had never found a man that had ever heard or known of John Knausch. The prosecution, as part of its case, here

undertook to prove a negative—to prove the nonexistence of John Knausch. As the evidence of the defendant left Knausch a wanderer, without fixed habitation or abode, the only evidence in rebuttal which the people could introduce was evidence that, after diligent investigation and inquiry in every place where the testimony of Sanders located Knausch as having been, no trace of him could be discovered, and to this effect was the evidence of Scott. It may at once be said that the evidence was not conclusive; that under the circumstances shown, Knausch might still have existed, and yet knowledge of his existence have escaped the inquiries of the officer; but this goes merely to the weight of the evidence, which was exclusively for the jury. Conceding, indeed, that the evidence was slight, it was in its nature the best evidence which the prosecution could bring forward, and how much or how little importance should be attached to it was for the jury alone to say.

The defense introduced in evidence a letter purporting to have accompanied the alleged forged draft, which letter made reference to the draft as an inclosure, and gave directions as to the disposition of the moneys to be obtained upon it. Four witnesses familiar with the handwriting of Wootton testified, for the defense, to their belief that the letter was written and signed by him. Against this no direct opposing evidence was offered by the people. The court refused certain instructions proposed by the defense (Nos. 51 and 52), to the general tenor and effect that the failure of the prosecution to introduce rebutting evidence made it the duty of the jury to treat and consider the letter as written and signed by Wootton. These instructions were properly refused. While there was no expert evidence upon the question of the letter in opposition to that introduced by the defense, other evidence in the case, and, indeed, all of the evidence in the case upon the part of the people, tended to show that it was impossible for the letter to have been written by Wootton. The mere fact that experts were not called in direct rebuttal of the testimony of the defense upon the subject of the letter did not leave the case of the people without any evidence tending to show its fictitious character.

It will be remembered that the notarial certificates to many of the instruments introduced in evidence were executed by

the defendant, Sanders, himself a notary public. The defendant offered, and the court refused, certain instructions (Nos. 53, 54 and 55) as to the presumption that public officers properly perform their duties; that a notary public is a public officer; and that the certificate of a notary of the acknowledgment of a deed is prima facie evidence of the facts stated in the certificate. These instructions are sound, as expositions of the law, but they were properly refused by the court in this case. In a civil action the notarial certificate of acknowledgment entitles a deed to be placed of record, and, when thus placed of record, the recordation carries constructive notice to the world. When offered in evidence, the effect of such a deed with its certificate is to shift the burden of proving that it is not a genuine and duly executed instrument to the side opposing. For this reason it has come to be and is truly said in the law that the notarial certificate is prima facie evidence of the facts therein stated, and of the character of the officer taking the acknowledgment, which character is recited therein. But in this case the burden of proof was always upon the people to show the false and fraudulent character of the instrument, and the presumption of innocence always remained with the defendant until overcome by the evidence. It was upon the prosecution to establish to the satisfaction of the jury that the instruments were not genuine. The defendant testified with positiveness that they were genuine. As against the proof required to be established by the people, and the declarations thus made by the defendant himself, the mere presumption of regularity or due execution amounted to nothing. The presumption could neither have added to nor detracted from the weight and effect of defendant's own statements.

Many of the instructions proposed by the defendant and refused by the court were sufficiently covered by those given of the court's own motion. Others, however, were not fully embraced in the instructions given. Defendant's proposed instruction No. 18, as to the reception by the jury of evidence of extrajudicial admissions or confessions, was unobjectionable in law, and should have been given. Instruction No. 40 might also well have been given. Instruction No. 46 declared to the jury that they were not to presume, as a circumstance in the case tending to show that the defendant was guilty of uttering the instrument with knowledge that it was forged,

that the said William Wootton was dead at the time the draft was written, passed or uttered, unless the prosecution had established by the evidence in this case, to their satisfaction, and beyond a reasonable doubt, the fact that he was dead at that time, and that the defendant so knew. Some stress is laid upon the alleged error of the court in refusing this instruction. We think, however, it was properly refused. The jury were not to be debarred from considering this evidence, with all the evidence in this case, because the death of Wootton might not have been proved to their satisfaction beyond a reasonable doubt; for the death of Wootton might not have been, under the evidence and in the view of the jury necessary to be conclusively established to warrant a verdict. If, however, the jury believed from the evidence that the defendant was not guilty, unless it were proved that Wootton was dead, and that Sanders knew of his death, then, under such a state of the evidence, it would unquestionably be incumbent upon the prosecution to establish the fact of his death, and of defendant's knowledge thereof, beyond and to the exclusion of any reasonable doubt.

We note no other points presented by appellant that seems to call for a special comment, saving the objection to the argument of the district attorney. A book of blank drafts introduced in evidence was claimed by the prosecution to be in a different condition from that in which it was upon a former trial. Defendant was not interrogated upon the subject of the book. The district attorney, in argument, commented upon this, saying that, if it was in the same condition now as it had previously been, the defendant, better than anyone, could have explained and testified to that fact. Defendant's failure to testify upon any particular point should not be commented on in argument: People v. McGungill, 41 Cal. 429; State v. Fairlamb, 121 Mo. 137, 25 S. W. 895.

For the foregoing reasons, the judgment and order are reversed and the cause remanded for a new trial.

We concur: McFarland, J.; Temple, J.