[Crim. No. 3724. In Bank.—April 9, 1934.]

THE PEOPLE, Respondent, v. WALTER LEWIS, Appellant.

Byrl R. Salsman for Appellant.

U. S. Webb, Attorney-General, and Seibert L. Sefton, Deputy Attorney-General, for Respondent.

PRESTON, J.—Appellant was convicted of murder in the first degree and sentenced to suffer the death penalty. He appeals from the judgment of conviction and order denying his motion for new trial.

The record is singularly free from error and the appeal presents no ground for reversal of the judgment. ▓▓ Evidence was offered by the prosecution to prove that the murder was deliberate, premeditated and accomplished in an attempt to perpetrate a rape, at a time when appellant was sober and in possession of his faculties. Appellant claims that he made no attempt to commit rape but struck the fatal blow without the deliberation necessary to first degree murder (sec. 189, Pen. Code), his act being "that of a drunken man—unreasoning and without cause". Appellant also, in effect, asks us to overrule, or hold here inapplicable, the doctrine long established in this jurisdiction, that to constitute murder of the first degree, there need be no appreciable space of time between the intention to kill and the act of killing. (*People* v. *Donnelly*, 190 Cal. 57 [210 Pac. 523]; 13 Cal. Jur., p. 598, sec. 15, and many cases cited.)

This argument requires no discussion in view of the fact that there is in the record ample evidence to support the verdict, either on the ground that the killing was wilful, deliberate and premeditated, or that it was committed in an attempt to perpetrate rape. There is also persuasive evidence of appellant's sobriety at the times in question. A brief statement of fact will serve as a basis for this conclusion:

Appellant, a colored man, fifty-one years of age, and a colored woman living with him and passing as his wife, resided at Mayfield, Palo Alto, California, in a shack at the rear of premises occupied by Mrs. Wright, also colored and a sister of the deceased. The crime was committed on February 4, 1933, in the evening. On that day appellant spent the time from about 9 o'clock in the morning until between 4 and 5 in the afternoon, in making a trip by automobile from Palo Alto to Oakland, and return, in the company of a colored friend and his son. These parties performed respective errands in and around Oakland and there purchased a pint or more of whisky, which was partially con-

sumed by appellant and his friend prior to reaching home. At one place where he called during the day appellant was given a drink of whisky and of beer; in addition he took three or four drinks from the bottle of whisky above mentioned. However, his companions testified that he was sober at all times and their testimony was corroborated by various witnesses who saw and talked with appellant after he returned home. Indeed, the evidence in support of the defense of intoxication is unsatisfactory and at most it only raised a conflict which the jury was thoroughly warranted in resolving adversely to appellant.

When appellant arrived home his "wife" was not there. He feared that she might have left him for good and immediately went about the neighborhood making inquiry as to her whereabouts. As a result his suspicion that she had gone ripened into conviction. He returned to the shack, where he lay down on the bed. The deceased was a colored girl about thirty years of age, small of stature, partially crippled, of good moral repute and unmarried. She had known appellant casually since 1919, had seen him frequently during the several months her sister let him live in the shack, and they were friendly, "just like home people" to each other. About 9 o'clock of the night in question the deceased called at her sister's to attend a party but found that she was too early as her sister had not yet come home. She then went to the shack in back, knocked at the door and when appellant answered, started to converse with him about his "wife". At his invitation she entered the room to continue her visit with him. The murder was committed soon thereafter.

Appellant contends that at said time he was so intoxicated as not to be accountable for his acts. He further claims that this is true although the effect which the day's drinking had upon him might not have been apparent to those who observed·and talked with him. He testified that the killing occurred in the following manner: "I just threw a fit; I jumped up and struck her, that is all. I had no cause, or I cannot give no account. . . . Only being drunk, that is all." He further testified that he made no effort to have sexual intercourse with the deceased; that he had the "first thought" of striking her at the time he struck her; that afterward he left the shack, walked up past the

Mayfield depot and on up the railroad track some distance and then lay down and stayed until it was light, whereupon he continued to move on. This version of the crime differed materially from that given by appellant on various occasions subsequent to his apprehension and prior to trial, as will be hereinafter shown.

About 9:30 P. M. the sister of the deceased arrived home and soon became concerned over the latter's nonappearance. Later she reported the unaccountable absence of the deceased to the police. About 10:30 she and the police searched the premises. They tried the door of the shack, found it locked, forced their way in and discovered the body of the girl. She had been hit with a blunt instrument (an axe wielded by appellant) on the head so severely as to break the left side of her skull into fifteen different pieces in the circular area near the bruise. The blow had evidently caused immediate death. There was no indication of a struggle. The body lay across the bed, with legs hanging over the edge, the head sunk in the bedclothes and surrounded by a pool of blood. The dress and underskirt of the deceased had been thrown back over her so that the lower portion of her body was exposed. Medical examination showed her organs to be in normal condition, without physical evidence of any forced attack upon her. The physician testified, however, that owing to her age, sexual intercourse would not necessarily be revealed by an autopsy. On the floor near by was found an axe, the head thereof covered with fresh blood. Also on the floor, and under the left foot of the deceased, was found a knife with a spot of blood thereon but there was no proof that the deceased had tried to use this knife in self-defense.

Appellant was arrested in March at a hobo camp near El Centro, California. During the days following his apprehension he talked freely and voluntarily with the officers about his commission of the crime and his mental state prior thereto. He twice affixed his name to statements purporting to give a full report of the occurrence. The following is taken from the first of these statements: "I came home from Oakland and I found my wife gone and I went out to look for her and I came back home and I came in contact with Eatha Holliday. She came out to the house and sat down and talked. I told her that my wife

had quit me and she said she would be my girl. And she said that she would come to see me twice or three times a week. She told me how much she cared for me. There was no argument nor fight nor nothing and I was just drunk and knocked her in the head with an axe. I remember hitting her but I didn't know she was dead. After I struck her I just walked out and shut the door . . . I kept the axe setting in the closet. I just walked over and got it and struck her with it. She was laying down on the bed and I left her laying down on the bed. I was standing up when I struck her. . . . ''

The following is taken from a later account given by appellant to police officials and subscribed by him: ''Ernestine Halliday came out to see him in the shack; she asked for his wife and said that she had been out there previously when he was not there. He admitted trying to ''make'' (have intercourse with) her but she was not willing. He stated that he was terribly worked up over his wife having left him. His wife was not really his wife but a woman who was living with him. All his life he had trouble with women and he resented keenly anyone who would try to take any of his women away from him, and he was crazy because the woman he had been living with had left. . . . ''

It is clear from the above recital, which sets forth but part of the testimony in behalf of the prosecution, that the record in this cause contains abundant evidence to support the verdict and judgment.

The judgment is affirmed. The order denying motion for new trial is affirmed.

Langdon, J., Thompson, J., Shenk, J., Seawell, J., and Waste, C. J., concurred.