[Crim. No. 5992.  In Bank.  May 10, 1957.]

THE PEOPLE, Respondent, v. WILLIAM GERALD MOORE, JR., Appellant.

John C. McCarthy and Theo. G. Krumm, under appointment by the Supreme Court, for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, Raymond M. Momboisse, Deputy Attorney General, Lowell E. Lathrop, District Attorney (San Bernardino), and J. Steve Williams, Deputy District Attorney, for Respondent.

SPENCE, J.—Defendant pleaded not guilty and not guilty by reason of insanity to the charge of murdering one Hulda Hoag. The jury found him guilty of murder in the first degree and fixed the penalty at death. Defendant withdrew his insanity plea and, after his motion for new trial had been denied, the death penalty was imposed. The appeal is automatic under section 1239, subdivision (b), of the Penal Code.

Mrs. Hoag was killed at some time between 8 and 11 o'clock on the evening of March 16, 1956. In the afternoon of that day defendant, a 33-year-old carnival worker, left a bar in San Bernardino with a woman (not Mrs. Hoag), and the couple entered a taxicab. They discussed whether they should go to a motel or the woman's house, and she gave the driver her address. Defendant argued with the woman when she said he could not enter her home, and he refused to pay the fare since there was "nothing in it" for him. He left the taxicab and was finally given a ride back to the downtown area by policemen who had investigated the incident.

Defendant entered another tavern about 5 o'clock that afternoon, had several beers, and struck up a conversation with Mrs. Hoag, who was 62 years old. Their friendship apparently ripened quickly, and he invited her to come and live with him. By 7:30, hugging and kissing had led to more intimate advances. Because of this and because Mrs. Hoag had become ill, the bartender asked the couple to leave and called a taxicab for them.

The driver of this vehicle testified that defendant instructed him to drive to the location of the carnival trailers at the National Orange Show. During the trip, which lasted about half an hour, defendant continued "making love to" Mrs. Hoag. At about 8 o'clock the driver left the couple near a field where the trailers were parked and saw them cross a cable and enter the field. Both had obviously been drinking and Mrs. Hoag, who was staggering, was assisted by defendant.

Defendant testified that he and Mrs. Hoag then sat on the running board of a truck and drank from a bottle which he had

with him; that they "started playing around a little like we did in that bar"; and that they "got into a little argument." He told her that they "had to sleep in the van," as he "didn't make the kind of money to sleep in a hotel." Mrs. Hoag refused to sleep in the van, and he told her "You are just as bad as the other woman that was in the taxicab after me previous to that."

A carnival worker who was sleeping in one of the vans heard a woman's voice say "Don't do this," or "Oh, don't do this to me." He also heard a sound of scraping which seemed to come from the vicinity of an adjoining van. He did not believe that the voice he heard showed distress, and he did not disturb himself.

Shortly before 11 that evening another carnival worker discovered Mrs. Hoag's nude body in a field near the trailers and summoned officers. The body was cold, with only slight warmth between the head and shoulders where they were pressed together. There was no pulse. Her clothing and personal effects were scattered over and near the trailers. A pass to a roller derby was also discovered in the vicinity.

Mrs. Hoag had been severely beaten. Her breastbone and eight ribs had been fractured. The body was scratched and bruised but she had died, according to the autopsy surgeon, from shock and hemorrhages from internal injuries. These injuries were caused by blows which could have been administered by a fist, knee, or shod foot. There was no testimony showing that Mrs. Hoag had been actually raped, but the surgeon did testify that there were contusions on the outer section of the sex organs and bruises and scratches on the front surface of the thighs.

Black and white photographs and colored slides, showing the body as it was found and also showing the general area, were admitted in evidence. They were used by the surgeon and other witnesses while explaining the victim's injuries and the scene of the crime.

Footprints were found near the trailers. A footprint expert testified that defendant was wearing shoes that could have made the prints. Defendant was questioned and thereafter arrested. Pictures of footprints made by defendant after his arrest were compared with footprints found at the scene. The prints were similar.

A criminologist testified that while there were several spots of human blood on the trousers which defendant wore on March 16, their areas were too small to identify the type of the blood. No seminal spots were found on defendant's cloth-

ing nor were any identifiable fingerprints discovered on the items found at the scene of the killing. There were two small tears on defendant's trousers, near the hip pockets. These could have been made if defendant had backed into a barbed wire fence near the trailers while dragging the body to the place where it was found.

Defendant sought to quit his job the morning after the killing but was told that he could not leave until the carnival closed. His employer testified that defendant did not tell him why he wanted to quit. The employer admitted that he had previously spoken to defendant's former employers who may have stated that they would have liked to have defendant work for them again.

Defendant told a deputy sheriff, and again stated on cross-examination, that he had served a sentence in Iowa for rape.

The sheriff testified that he asked defendant after his arrest why he had killed Mrs. Hoag and defendant replied, ''I don't know why I did it,'' that he did not want to hurt anyone and that ''I don't remember. I blacked out. I can't remember anything.'' The sheriff also testified that defendant later sought to plead guilty to second degree murder and stated that he remembered more than he had told the officers but if he told them more he ''would burn for sure.''

Defendant testified that he had been drinking beer and whiskey all afternoon on March 16, that he met Mrs. Hoag at the bar and gave her a roller derby pass, and that he brought her to the carnival trailers near the fair grounds. He decided, he said, that they had drunk too much to visit the fair itself or to have intercourse; and when she objected to sleeping in one of the carnival vans, they argued and he left her. He stated that he then went to a tavern in Colton with a fellow employee for more drinks, returned to the carnival, went to sleep in the cab of a truck at the carnival, and awoke the next morning on a carrousel.

Defendant also testified that his employer knew he wished to quit because his former employers had offered him a better job. He stated that he told the sheriff. ''I didn't do it. If I did, I didn't know I did.'' He also testified that the sheriff had tried to convince him that he should plead guilty to second degree murder but he refused.

On cross-examination defendant admitted that he had lied during preliminary questioning by sheriff's deputies when he told them that he had returned to the fair grounds during the afternoon of March 16.

Defendant's only other witness was a woman who also worked at the carnival. She corroborated one phase of his testimony by stating that she was with defendant when he tore his trousers while repairing the carnival equipment.

Defendant contends that the trial court committed prejudicial error in admitting in evidence the three colored slides picturing the victim's body. While the photographer testified that one transparency had a red or orange effect from the light and the type of film used, he also stated that the objects pictured were accurately reproduced and that the color of the body and wounds was not distorted. While such evidence should be faithful and accurate (*People* v. *Goodwin,* 9 Cal.2d 711, 714 [72 P.2d 551]), it was within the discretion of the trial court to admit the pictures, particularly when the jury had heard the testimony as to the color and its causes. (See *People* v. *Burwell*, 44 Cal.2d 16, 34 [279 P.2d 744].)

Defendant also argues that the transparencies were irrelevant since the surgeon testified that Mrs. Hoag died of internal injuries. These were caused, however, by the external blows, the nature of which appeared from the transparencies. The introduction of photographs showing the body of the victim has been disapproved "where no useful purpose is served thereby" (*People* v. *Sisson*, 1 Cal.2d 510, 511 [36 P.2d 116]), but the pictures here were such as would aid the jury in determining the circumstances surrounding Mrs. Hoag's death. (See *People* v. *Osborn*, 37 Cal.2d 380, 383 [231 P.2d 850] ; *People* v. *Dunn*, 29 Cal.2d 654, 659 [177 P.2d 553].)

Defendant next contends that it was prejudicial error to admit the evidence concerning his afternoon taxicab ride with another woman. However, this evidence of defendant's earlier activities was relevant on the question of his intent and purpose in picking up strange women, including Mrs. Hoag. Thus the evidence showed that, within a relatively short time before Mrs. Hoag was killed, defendant had been twice frustrated in his obvious desire and purpose to engage in sexual intercourse. It could therefore be reasonably inferred from all the evidence that defendant had been aroused to the point of using force and that he did use force in attempting to accomplish his purpose with Mrs. Hoag.

"The general tests of the admissibility of evidence in a criminal case are: . . . does it tend logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense? If it does, then it is admissible, whether it embraces the commission of another crime or does

not, whether the other crime be similar in kind or not, whether it be part of a single design or not." (*People* v. *Sanders,* 114 Cal. 216, 230 [46 P. 153]; see also *People* v. *Peete,* 28 Cal.2d 306, 315 [169 P.2d 924], and cases cited.)

Defendant's final contention is that the evidence is insufficient to support his conviction. ▪ It is true that the evidence is largely circumstantial, but such evidence "is as sufficient to convict as direct evidence." (*People* v. *Reed,* 38 Cal.2d 423, 431 [240 P.2d 590].)

▪ Defendant argues that even if there is sufficient evidence to sustain his conviction of murder, the circumstances surrounding the murder are undisclosed, and therefore the verdict should be murder of the second degree. (*People* v. *Howard,* 211 Cal. 322, 329 [295 P. 333, 71 A.L.R. 1385].) Here, however, the testimony, including that showing defendant's obvious desire and purpose to have sexual intercourse with Mrs. Hoag, her refusal to go to the van for that purpose, the nature of the injuries to her body when found near the van, and the fact that her clothing had been torn off, was sufficient evidence to sustain the implied finding that defendant had killed her in the course of an attempted rape. (*People* v. *Lewis,* 220 Cal. 510 [31 P.2d 357]; *People* v. *Wheelock,* 6 Cal.Unrep. 914 [68 P. 579].) Such a killing, under the felony murder doctrine (Pen. Code, § 189), constitutes first degree murder.

Defendant makes no complaint concerning the instructions. The jury was properly instructed on the elements of rape, attempted rape, and the felony murder doctrine. There was ample evidence to sustain the verdict of first degree murder under that doctrine.

The judgment and order denying a new trial are affirmed.

Gibson, C. J., Shenk, J., and McComb, J., concurred.

CARTER, J.—I dissent.

I do not agree that the evidence is sufficient to support the judgment of conviction of first degree murder; I also am of the opinion that the evidence concerning defendant's conduct earlier in the day of the crime could have had no other object, or effect, than to prejudice the defendant in the eyes of the jury.

Even the People do "not stress the argument" that defendant was guilty of premeditated, deliberate and wilful murder, but argue that this was a killing committed in the attempt to

commit, or the actual perpetration of, rape. There is absolutely no evidence whatsoever in the record to support this latter theory: The victim willingly engaged in making love, and permitting the defendant to make love to her; she went with him voluntarily with the expressed purpose of having sexual intercourse with him—not only that night, but in the future since she intended to live with him and tentative arrangements were made for another patron of the bar to take her and the defendant to her home and pick up her belongings the following Sunday morning.

The testimony concerning the defendant's and victim's supposed presence at the trailer when the victim was overheard to say "Don't do this" or "Oh, don't do this to me" was expressly stated by the witness to be that the woman did not seem to be in any distress and "wasn't screaming, anything like that." The witness testified that he didn't hear a man's voice; that for a few seconds he heard something like scraping against tin. Defendant testified that when the victim refused to sleep in the trailer with him that he got up and left her, fully clothed, and walked alone toward the show grounds where he met a coworker who went with him to another bar; that he later returned to the show and woke up the next morning on a merry-go-round without knowing how he got there.

The evidence directly linking defendant with the crime is almost nonexistent: He was identified as the man who was last seen walking to the trailers with the victim. There was no evidence on his clothing except two tears on his pants' pockets, which were proved to have occurred at an earlier time; and two unidentifiable minute blood spots on the back of one pants' leg. There were no blood stains on his shoes, no scrapings from under his nails connecting him with the victim; the only prints from his shoes were in the spot where he had been last seen with the woman when she was alive. There was nothing on defendant's clothing suggesting he had either raped, or killed, the woman. Circumstantial evidence and each link in the chain of circumstantial evidence must prove beyond a reasonable doubt that the defendant committed the crime with which he was charged, and, furthermore, each link of that chain of circumstantial evidence must be irreconcilable with any other rational conclusion (*People* v. *Hatchett,* 63 Cal.App.2d 144 [146 P.2d 469] ; *People* v. *Rayol,* 65 Cal.App.2d 462 [150 P.2d 812] ; *People* v. *Koenig,* 29 Cal.2d 87 [173 P.2d 1] ).

In considering the applicable law, it should be noted that a woman's voice was heard, but that the one hearing the words did not consider that she was in distress; no man's voice was heard; no violent sounds were heard; no signs were found on defendant's clothing or hands which would even suggest he had committed the crime. The only evidence linking defendant with the victim is that they had set out together with the avowed purpose of engaging, voluntarily, in sexual intercourse; that they had been engaged in drinking, and making love, publicly for some time; that they were seen walking together toward the trailers. There was ample evidence in the record that other men and women slept in the trailers, and outside of them.

With respect to the evidence as to defendant's conduct on the afternoon of the day of the crime, its only purpose could have been to inflame the passion and prejudice of the jury. The general rule is that such evidence is inadmissible. There is an exception to the rule that such evidence is admissible when it is relevant to the issues in the case (*People* v. *Evans,* 113 Cal.App.2d 124, 126 [247 P.2d 915]). The primary theory on which this case was tried was that defendant killed his victim in the attempt to commit rape, or in the actual commission of rape. The evidence complained of concerned the woman with whom defendant had left the bar earlier in the day. After she and the defendant arrived at her home, where he had expected to have intercourse with her, she refused to let him in the house. He then refused to pay the cab driver and was taken back into town by the police. From this the majority infers that defendant was aroused to the point of rape by force and violence due to the frustration of his sexual desires. Even though I am of the opinion that the evidence was inadmissible for any purpose since it showed only defendant's desire for sexual intercourse and had nothing whatsoever to do with either rape, or murder, since both women were apparently quite willing to go with defendant, its prejudicial effect upon the jury cannot be discounted. With the first woman's refusal to comply with defendant's wishes, he merely left her and refused to pay the taxi fare. There is nothing in this evidence which has any bearing on the issues of intent to commit rape with force and violence, or intent to kill, or a killing committed in the attempt to perpetrate, or the commission of rape. In other words, to support murder of the first degree under the theory that it was committed in the attempt to commit, or the commission of, rape, the evidence

must show either lack of consent, or the use of force and violence in the commission of the act. When the conduct of the parties here is considered, it is apparent that there was no lack of consent on the part of the victim because she was with the defendant for the purpose of having intercourse with him. This is also true of the other woman who, apparently, later changed her mind. There was, however, no intimation that her change of mind caused any violence, or threat of violence, on defendant's part. Inasmuch as he was charged with murder of the first degree on the theory that he committed said killing in the attempt to commit rape, or the commission thereof, it is difficult for me to see how the evidence could have been considered admissible on any theory. It is clear, however, that the effect of it was to prove to the jury that the defendant was a "bad" and "immoral" man capable of any crime and since he was the last one to be seen with her, even though she was with him voluntarily and willingly, and even though there was no further evidence linking him with the killing that he must have been the guilty one.

I would reverse the judgment because I do not believe the evidence is sufficient and because I believe that the admission of the evidence of defendant's conduct earlier that afternoon was prejudicially erroneous.

Traynor, J., concurred.

SCHAUER, J., Dissenting.—The evidence is obviously sufficient to establish a criminal homicide. It is also suggestive that defendant is the guilty perpetrator. But it convincingly negates, rather than proves, murder in an attempt to commit rape. It is not sufficient to establish premeditated murder. In the state of the record, and in the light of the errors pointed out by Mr. Justice Carter, the conviction, in my view, should be reduced to murder of the second degree. Failing such action, the judgment should be reversed. Imposition of the death penalty in a case such as this is manifestly a miscarriage of justice and an abuse of the penalty.

Appellant's petition for a rehearing was denied June 4, 1957. Carter, J., Traynor, J., and Schauer, J., were of the opinion that the petition should be granted.