[Crim. No. 170. Fifth Dist. Jan. 6, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. YNES SUBIA
Defendant and Appellant.

Jack M. Tipton, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edward A. Hinz, Jr., and Roger E. Venturi, Deputy Attorneys General, for Plaintiff and Respondent.

CONLEY, P. J.—Ynes Subia was convicted of murdering Irene Walker on a canal bank near Los Banos; the crime was adjudged to be murder in the first degree, and the defendant was sentenced to life imprisonment. Counsel for the defendant does not claim that the evidence was insufficient to justify a conviction of murder. On the contrary, his efforts are strictly confined to the contention that the trial court should have found that the crime was murder in the second, rather than in the first, degree.

The homicide took place on the 9th day of November, 1964; the defendant was arrested and accused of the murder on that same day; he was arraigned on December 14, 1964, and, being represented by the public defender, entered pleas of not guilty and not guilty by reason of insanity. He originally asked for a jury trial, but on January 21, 1965, he and his counsel waived a jury and joined the district attorney in submitting the case on the preliminary examination, a statement made by the defendant to the district attorney on the 9th day of November, 1964, and the written opinions of the alienists. Thereafter, the court found that the defendant was guilty of murder in the first degree, and that he was legally sane at the time of the commission of the offense and sentenced him to life imprisonment.

The evidence shows that the defendant was in the Mission Club, a bar in Los Banos, on three different occasions during the evening of November 8. He had several bottles of beer before 9 p.m.; he left the bar and returned about 11 p.m., when he picked up his father to take him home; he returned again after midnight. The victim, Irene Walker, came into the cafe slightly later than defendant's last return; she had been in Los Banos for about a week, having hired a room at the home of one of the witnesses; she appeared to be a virtual stranger in the community with a propensity for drinking. As the defendant sat at the bar, she approached him and started a conversation, which lasted for only a few minutes; then the two left together. It would appear that this was the first time that the defendant had ever met or talked with the victim. During their short conversation at the bar, no one else

heard what they said to each other, and no one saw the victim alive again except the defendant.

In his statement made to the district attorney on the same day as the crime, the defendant admitted that he had met the woman at the bar; that she was drunk; that she said she would go any place with him, and that he agreed to take her home; instead of going to her temporary residence, the defendant proceeded to a lonely spot on the bank of the Delta Mendota Canal; he admitted that he expected to have sexual intercourse with her, but when he parked his car and began a more intense approach, she refused to carry out her implied promise and said she would rather go home. The defendant claimed that he did not remember what they talked about. The officials, after the murder, found some blood spots in the interior of the car, which would lead to the inference that the defendant exercised force against the victim while they were in the automobile. Certain it is that Irene Walker was able to get out of the vehicle; the defendant said that she struck him with her hand and that he responded by knocking her down; he admitted that he went back to the trunk of the car, opened it, and got something out of the trunk with which to hit her. He did strike her repeatedly. After the victim's death, he hid a file and a hammer, which had been in the trunk, with the clothing of the victim as hereinafter related, and it is a proper inference from the evidence relative to the multiple bruises, cuts, and fractures, which she received, and the traces of human blood and hair on the metal instruments, that he used both deadly weapons to beat her. The trier of fact could well have found from the evidence that during the struggle he ripped the clothing from the decedent; after expressing doubt, the defendant finally denied that he consummated sexual relations with her. In his evasive statement to the district attorney, he said that he did not remember what he did, but that he was so scared he did not think he raped the victim. He said he thought she started to scream when he got something out of the car with which to hit her. He admitted that when he first struck the victim she was fully dressed. Before leaving the scene of the crime, he put all of her clothes in the back seat of his car. She was still breathing when he left her nude on the canal bank to die. When the defendant got home, he hid the clothing, the hammer, and the file behind the bathtub in his house and told his wife that he thought he had hurt someone.

Dr. Faber testified that he conducted an autopsy at 10 a.m. on November 9. He stated that the victim was killed by ''cer-

tainly more than one blow," but he could not say how many times she had been hit on the right side of the head and on the left forehead about the left eye. The cause of death was "secondary to multiple traumatic injuries which consisted of lacerations, skull fracture, and extensive damage to the brain." The file had traces of blood and strands of the victim's hair on it, and the head of the hammer, also, had some of the victim's hair attached.

George Roche, a criminologist, testified that he examined for seminal fluid every garment which was furnished him (i.e., the woman's clothing and the jacket of the defendant) and found none.

Dr. Mevi testified that he inspected the victim's body for evidence of sexual violence, the examination being made at 7:30 in the evening of the day of the crime; he said that he found male sperm with dead spermatozoa in a vaginal smear taken from the victim's body, but that he could not state the time of the sexual intercourse, which caused the condition. When the doctor was asked for an estimate of the time that the sperm had been present, he answered, "Well, they usually quote 48 hours, but it was probably a little bit longer than that perhaps." He was asked, "Possibly it had been deposited as much as 48 hours before the time you examined it?" He answered, "That's right." He found no evidence of marks or tears of the vagina or rectum, but he did find teeth marks on the breast. Sergeant Bowling testified there were teeth marks on her back and left breast.

There is only one question on appeal: whether there is sufficient evidence to support a conviction of murder in the first degree; the defendant claims, (1) that there is no substantial evidence to show that the homicide was wilful, deliberate, and premeditated, and (2) that there is insufficient evidence as a matter of law to support a conviction of murder under the "felony murder doctrine" as to which the Legislature has stated that murder which is perpetrated "by means of poison, or lying in wait, torture, . . . or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288, is murder of the first degree; . . ." (Pen. Code, § 189.) On the contrary, the respondent claims that there is evidence which gave the finder of fact ample ground to determine that the murder was wilful, deliberate, and premeditated, and that the homicide was in fact committed during the perpetration of rape, or at least an attempt to

commit rape, and that it is, therefore, within the felony-murder rule contained in section 189 of the Penal Code.

If either of these alternative claims is supported by substantial evidence, the finding of murder in the first degree is correct, and this court need not concern itself with the other possibility.

As a jury trial was waived by stipulation, the judge became the sole finder of fact; in such circumstances, he had the same right as a jury would have had to consider all of the evidence and to draw legitimate inferences from the testimony. It is not within the province of an appellate court to determine conflicts in the evidence, or to choose between different inferences which might have been reasonably drawn by the trial judge.

As is said in *People* v. *Lindley*, 26 Cal.2d 780, 791 [161 P.2d 227], relative to an examination of the evidentiary showing on appeal: ". . . even where the showing is not conclusive, if the record affords substantial support for the conclusion that one of the enumerated felonies was perpetrated or attempted, and the killing was committed in such perpetration or attempt, the judgment must be affirmed." (See *People* v. *Diaz*, 26 Cal.2d 318 [158 P.2d 194]; *People* v. *Brown*, 22 Cal.2d 752 [141 P.2d 1]; *People* v. *Waller*, 14 Cal.2d 693 [96 P.2d 344]; *People* v. *Green*, 13 Cal.2d 37 [87 P.2d 821]; *People* v. *Martin*, 12 Cal.2d 466 [85 P.2d 880]; *People* v. *Anderson*, 1 Cal.2d 687 [37 P.2d 67]; *People* v. *Miller*, 121 Cal. 343, 347 [53 P. 816]; *People* v. *De La Roi*, 36 Cal.App.2d 287 [97 P.2d 836]; *People* v. *Meyers*, 7 Cal.App. 2d 351 [46 P.2d 282].)

The Supreme Court said on page 791 of the opinion in the *Lindley* case, *supra*: "After conviction all intendments are in favor of the judgment and a verdict will not be set aside unless the record clearly shows that upon no hypothesis whatsoever is there sufficient substantial evidence to support it." (*People* v. *Latona*, 2 Cal.2d 714 [43 P.2d 260]; *People* v. *Green, supra*, 13 Cal.2d 37; *People* v. *De La Roi, supra*, 36 Cal.App.2d 287.)

 In the instant case, the defendant, actuated by the desire to have sexual intercourse with the decedent, stopped his automobile in a lonely place on the ditch bank of the canal; he pressed his desires upon the woman, who resisted. The defendant testified:

"Q. Well, your object was to have sex relations with her, right? That's what you went out there for?

"A. Yes.

"Q. And that's what you tried to do? A. Yes.

"Q. And she didn't want to? A. Yes.

"Q. And then you hit her? A. Yes.

"Q. Then you knocked her down when you hit her with your fist?

"A. Yes.

"Q. She started screaming then? A. Yes.

"Q. What did you do then? A. Well, I went to the car to get what I hit her with.

"Q. And you unlocked the car? A. Yes.

"Q. Was it after then that you took her clothes off?

"A. I think so.

"Q. And was it after that that you held her head to see if she was breathing? A. Yes, before I left."

The evidence of blood spots in the car warrants the inference that he immediately exerted considerable force toward her. She succeeded in getting out of the automobile; he followed and attacked her, striking her and knocking her down. He then went back to his automobile and took from that portion of the car two iron instruments, a file and a hammer, with which he returned to the woman and unmercifully beat her. At the same time, he removed her clothing and carried on an attack with sexual overtones as shown by the bites on her left breast and back. He left her to die by the roadside, and he carried away and hid in his automobile her clothing and the hammer and file. The court had before it ample evidence to permit a determination that the killing took place in at least an attempt to perpetrate rape. The People maintain that there was sufficient evidence to permit the trier of fact to draw the legitimate conclusion that rape was in fact accomplished, but the testimony of the pathologist might well lead to a conclusion that the semen was deposited in the private parts of the woman earlier than the first meeting of the defendant and his victim. But there was proof at least of an attempt to commit rape, and that is all that was necessary in order to fix the degree of the offense as murder in the first degree. The rape itself did not have to be completed, and the fact that afterwards there was no gross disturbance of the sexual parts of the corpse of the victim does not show that there was not an attempt to commit the offense, even if abandoned before consummation. (*People* v. *Hillery*, 62 Cal. 2d 692, 705 [44 Cal.Rptr. 30, 401 P.2d 382].)

■ The homicide is committed in the perpetration of the felony if the killing and the felony are parts of one continuous plan or transaction. (*People* v. *Whitehorn*, 60 Cal.2d 256, 264 [32 Cal.Rptr. 199, 383 P.2d 783]; *People* v. *Mason*, 54 Cal.2d 164, 168-169 [4 Cal.Rptr. 841, 351 P.2d 1025]; *People* v. *Chavez*, 37 Cal.2d 656, 669-670 [234 P.2d 632].) An intention to commit the felony may be implied from the attendant facts and circumstances. (*People* v. *Moore*, 48 Cal.2d 541, 547; *People* v. *Lewis*, 220 Cal. 510 [31 P.2d 357].)

■ If the design of a person to commit a crime is clearly shown, the prosecution need only prove that slight acts were done in its furtherance. (*People* v. *Quicke*, 61 Cal.2d 155, 158; *People* v. *Downer*, 57 Cal.2d 800, 806 [22 Cal.Rptr. 347, 372 P.2d 107]; *People* v. *Cheary*, 48 Cal.2d 301, 310 [309 P.2d 431]; *People* v. *Thomas*, 164 Cal.App.2d 571, 574 [331 P.2d 82].)

The defendant places strong reliance upon the case of *People* v. *Craig*, 49 Cal.2d 313 [316 P.2d 947], in which it was claimed in a prosecution for murder that a rape had been attempted; there the majority of the court found that there was insufficient evidence in the record to show that the killing occurred in the course of an attempt to commit rape and directed the trial court to resentence the defendant for murder in the second degree. In that particular case, there was nothing whatsoever in the evidence to show that there had been a rape or attempted rape in the opinion of the majority of the court. In the present case, however, there was admittedly an intention on the part of the defendant to have sexual intercourse and a series of acts, including removal of the clothes from the victim, which corroborated the attempt to commit rape. If a man inflamed with drink and bent upon sexual intercourse, takes a woman to a lonely place, beats her savagely when she refuses his demands, tears the clothes from her body, and bites her on breast and back, the trier of fact is warranted in finding an attempt to commit rape and that the homicide is murder in the first degree.

The judgment is affirmed.

Brown (R.M.), J., and Stone, J., concurred.