[Crim. No. 570. First Appellate District.—February 23, 1916.]

THE PEOPLE, Respondent, v. TENUNZIO PITISCI, Appellant.

CRIMINAL LAW—MURDER—PREJUDICIAL REMARKS OF COURT—INTIMATION OF FALSITY OF DEFENSE.—In a prosecution for murder it is prejudicial error for the court, in the presence and hearing of the jury, when ruling upon an objection to evidence offered in support of the defendant's plea of self-defense, to remark that the claim that the deceased took the dagger, by means of which the killing was accomplished, from the person of the defendant was "an absurdity," and that the alleged threat of the deceased to kill the defendant was "a mere idle statement made by the deceased."

ID.—Instruction—Disclaimer of Opinion—Error not Cured.—Such error is not cured by an instruction given to the jury upon the conclusion of the argument upon the admissibility of such evidence that there· was no intent upon the part of the court to show its belief in either the truth or falsity of the testimony, nor to intimate any personal view as to its value.

ID.—Instruction to Disregard Misconduct—Removal of Prejudice— General Rule Inapplicable.—While, ordinarily, an admonition of the trial court to the jury to disregard misconduct of either the judge or district attorney will, in the absence of an affirmative showing of injury, suffice to remove any prejudice resulting therefrom in the minds of the jury, which rule is founded upon the presumption that the jury will heed the admonition of the trial judge, such presumption does not prevail in the presence of an impropriety upon the part of the trial judge, which in its very nature was calculated to weaken, if not utterly destroy, a legitimate and substantial defense apparently interposed in good faith.

ID.—Alleged Threat of Deceased — Proof Beyond Reasonable Doubt—Erroneous Instruction.—An instruction given at the request of the prosecution which in effect charged the jury not to consider the alleged threat of the deceased to kill the defendant, unless that fact had been clearly established in evidence beyond all reasonable doubt, is clearly erroneous, as such fact need be proved only by a preponderance of the evidence.

ID.—Misconduct of District Attorney—Statement of Contents of Excluded Letter.—It is misconduct for the district attorney to state to the court, in the presence and hearing of the jury, the contents of a letter addressed to the deceased and purporting to have been written by her husband, upon a second attempt to get the letter in evidence, where the letter had been read by the court upon its first offer.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco, and from an order denying a new trial. Frank H. Dunne, Judge.

The facts are stated in the opinion of the court.

O'Gara & De Martini, for Appellant.

U. S. Webb, Attorney-General, and John H. Riordan, Deputy Attorney-General, for Respondent.

LENNON, P. J.—The defendant was convicted of murder in the second degree. His defense was self-defense. He appeals from the judgment and order denying him a new trial.

The facts of the case upon which the conviction was sought and secured are substantially these: The defendant at the time of the homicide was an unmarried man of about 25 years of age. He was a Sicilian by birth. The deceased was an Andalusian. They became acquainted some time in the latter part of the year 1912. The deceased was a married woman, and at the time of the homicide was about 22 years of age, and was living apart from her husband because of marital difficulties. The acquaintance between the defendant and deceased developed into a *liaison,* which continued till within two weeks of her death. At about 8 o'clock on the evening of May, 8, 1914, the defendant called upon the deceased at her home, where she resided with her father and two brothers, and, save for the presence of her two babies, found her alone. Shortly thereafter Joseph A. Solemi, who resided with his mother in apartments immediately above those occupied by the deceased, heard a woman screaming. He ran down the stairs into the kitchen of the apartment of the deceased, and called out, "What's the matter, Mary?" The deceased cried out, "I am being murdered; I am being killed." Save for a light in the kitchen the premises of the deceased were in darkness when Solemi entered, but he proceeded to the room from whence the voice came, and there by the light of a cigarette-lighter he discovered the deceased and the defendant lying upon the floor. The deceased was face downward, and the defendant, with his hand closed over a dagger, was lying upon his back alongside of her with his head resting upon her hips. The police were then called, and an examination showed that both the deceased and the defendant were suffering from several severe knife wounds. One of the policemen attempted to question the defendant as to the cause of the affray, but the defendant made no reply save to say, "I wish I was dead." The record shows, however, that whatever was said by the defendant at that time to the policeman was said in Italian, and the witness who acted as interpreter and translated what the defendant had said was not certain whether the words were "I wish I was dead" or "I am dying." The deceased succumbed to her wounds on the way to the receiving hospital, and the defendant for several hours was in a semi-conscious condition as the result of his injuries.

As a witness in his own behalf the defendant testified
upon the trial, in substance, that in the latter part of the
year 1913, and during the time he was living in illicit re-
lations with the deceased, he became acquainted with and
began to pay court to a young woman of his own nationality,
and in January, 1914, became engaged to marry her. The
wedding was to take place in the month of July following;
and in the meantime the defendant endeavored to sever his
relations with the deceased, and to that end removed his
residence from San Francisco to San Jose, where on March
21, 1914, he wrote and mailed to her a letter, in which he
informed her that he intended to marry a girl of his own
nationality. The deceased in her answer and in several
other letters which she wrote to the defendant at various
times showed that she was deeply infatuated with him, and
indicated that she would not be content to give him up.
Upon one occasion the defendant visited San Francisco at
the request of the deceased, and attempted, though unsuc-
cessfully, to arrange an amicable severance of their relations.
In April, 1914, the defendant returned to San Francisco to
reside. After he had been in San Francisco for about a
week, during which time he had not called upon the deceased,
she, uninvited, called upon him several times at his apart-
ments. Two weeks before the homicide he met her at her
request on Powell Street near Broadway, and she then asked
him to leave San Francisco and go to Los Angeles with her.
Upon the defendant declining to do so she said, "Everybody
says you are going to marry the Italian girl, but before you
do so I will kill you." A few days before the homicide the
deceased approached defendant in the street and said to
him, "I want you to come to my house. Will you come?"
The defendant promised that he would call, and went there
accordingly on the evening of the homicide, at about 8
o'clock, as previously narrated. She received him affection-
ately; she "kissed him and caressed him," and while they
were sitting upon her bed without a light in the room she
said to him, "I want you to go to Los Angeles with me be-
cause my husband will be here. . . . to-morrow." The de-
fendant replied that he did not want to go to Los Angeles,
for the reason that he had no money and could not get em-
ployment there; whereupon the deceased said, "You want
to marry the Italian girl," to which the defendant answered,

"Yes." Thereupon the deceased suddenly pushed the appellant back upon her bed and placed one of her hands against either his chest or throat. The defendant always carried a dagger, of which fact the deceased was aware. While he was in that position on the bed and in the dark he felt a stinging sensation in his breast; he felt blood trickling down his body, and then realized that he had been stabbed by the deceased, evidently with his own dagger, which had been extracted by her from the place where he had been in the habit of carrying it on his person. Thereupon the defendant grappled with the deceased. She still fought with him and stabbed him, but finally he secured possession of the dagger, and in the frenzy of the fight stabbed her with it until she fell at his feet, and he, exhausted, sank alongside of her.

The foregoing statement of the facts of the killing and the circumstances immediately preceding and attending it, as narrated by the defendant, constituted the foundation of his plea of self-defense; and although that statement is incomplete in many matters of minor detail, nevertheless it will suffice for the consideration of the points presented in support of the appeal, viz.: (1) misconduct on the part of the trial judge, in the presence of the jury, resulting in substantial injury to the defense upon which the defendant relied; (2) alleged prejudicial misconduct of the district attorney; and (3) the giving of an instruction which erroneously charged the jury that the burden was upon the defendant to establish the existence of a fact upon which he relied in support of his plea of self-defense to a moral certainty and beyond a reasonable doubt.

The assignment of misconduct on the part of the trial judge deals primarily with certain comments of the trial judge made during the endeavor of counsel for the defendant to show in evidence, in support of his plea of self-defense, by the testimony of a witness upon the stand that the deceased had made a threat that she would kill the defendant "if he married the Italian girl." The proffered proof was objected to by the district attorney upon the ground that it was irrelevant, incompetent, and immaterial, and the trial judge apparently was of the opinion that it was not admissible in the absence of a showing that the threat of the deceased had been communicated to the defendant. The dis-

cussion of this question was had in the presence of the jury, and occupied a large part of two trial days. Upon this phase of the case the record speaks best, and is as follows:

"Q. You were on intimate relations with the deceased? A. Yes, sir.

"Q. She had visited at your house? A. Yes, sir.

"Q. During the early part of last winter or the latter part of the fall of last year did you ever have any conversation with the deceased regarding a divorce between herself and her husband? A. Yes, sir.

"Q. Also a conversation regarding trouble between herself and her husband? A. Yes, sir.

"Q. Now, what was that conversation?

"Mr. Berry (Deputy District Attorney) : Just one moment. We object to that question on the ground that it is incompetent, irrelevant, and immaterial.

"The Court: Sustained.

"Mr. De Martini (Counsel for Defendant) : Q. During the months of February and March did you have any conversation with the deceased relative to—

"The Court (Interrupting) : Well, now, Mr. De Martini, I don't see how you can expect to prove a conversation with the dead woman by this woman.

"Mr. De Martini: Well, if your Honor please, we want to show—

"The Court (Interrupting) : Well, you can't show it that way.

"Mr. O'Gara (Associate Counsel for the Defendant) : If your Honor please, the point is this: we expect to show— whether by this question or another I am not able to say . . . to show threats made by the deceased against the life of the defendant in regard to taking the life of the defendant.

"The Court: Threats?

"Mr. O'Gara: —in the course of conversations threats made by the deceased against the life of the defendant.

"The Court: —and communicated to this defendant? (Argument between court and counsel and reading of authorities.)    That would not assist you, Mr. O'Gara.

"Mr. O'Gara: I am afraid your Honor has not read the part I wish to call to your Honor's attention as to threats made showing motive.

"The Court: Just a mere idle statement made by this deceased and not communicated to the defendant, in the absence of anything else, is not proper.

"Mr. O'Gara: I wish to point out to your Honor that this certain question was discussed by the decision in this case, and threats were made against the life of this defendant, and whether it was communicated or not would not make any difference. In other words, this is the point, your Honor: Where it is the claim of the defendant that the other party was the aggressor, and the prosecution claims that it was the defendant who was the aggressor—

"The Court: Well, I have read the decision. I understand it and your point here—

"Mr. O'Gara: Well, I wanted to make a statement to your Honor of my point of view.

"The Court: I don't care about any argument. . . .

"Mr. O'Gara: I will offer at this time to prove by this witness that in the conversation referred to the deceased said to her that the defendant was going with an Italian girl and expected to marry her, but that before the defendant married that Italian girl she, the deceased, would kill him. I offer to show that was precisely stated by the deceased at that time and place by this witness.

"The Court: You don't propose to show that this statement was communicated to the defendant?

"Mr. O'Gara: No, your Honor, I do not.

"The Court (After Argument): I will not hear any more argument. As I say, in the decisions which you have suggested the facts are quite different than are the facts that appear here. In other words, I am satisfied that those facts do not appear here in this case. I don't want the jury to hear any more argument. I will continue the rest of the hearing until to-morrow morning and give you an opportunity to be heard then. Do I make myself plain now?"

"Mr. O'Gara: Yes, I understand your Honor exactly."

At the resumption of the trial on the following morning the record shows the following:

"The Clerk: The jurors are present, your Honor.

"Mr. O'Gara: If your Honor please—in relation to the question which was under discussion when the court took an adjournment last evening, I have brought to the court

this morning some cases on which I rely, and am prepared to submit them to your Honor.

"The Court (Addressing Mr. Berry) : What is the proposition?

"Mr. Berry: If counsel will permit, it will not be necessary to have him continue further on this subject, for I have examined authorities submitted by counsel, and also have delved into other authorities, and I find that under such circumstances as these evidence in this action is admissible though not being shown to have been communicated.     There is one case, and that is where there is some doubt as to who started the affray resulting in the death of the deceased.

"The Court: Yes, but I doubt if you will find any declaration of any court on any facts analogous to those I assume would be developed here.     In all those cases I am familiar with there was some evidence of a quarrel, or where both parties were in an excited state of mind; but here the defendant himself is the only person who had a weapon; it is not claimed that this woman had a weapon, but he went to this place, the place of the killing or the alleged killing, with this weapon.     It is claimed she took it from him—an absurdity.     Now, you keep in mind that the defendant himself goes to this place and he goes armed, and he is the only person who is armed.     It is not claimed that the deceased was armed.

"Mr. O'Gara: Yes, but there may be half a dozen people in this room who have got pistols in their pockets—

"The Court (Interrupting) : Confine your argument to the facts.     I have stated all the facts, have I not?

"Mr. O'Gara: No, your Honor, I don't think you have stated all the facts.

"The Court: I have stated the essential parts as we could gather them.

"Mr. O'Gara: The defendant went there without any thought or intention that there was to be trouble.

"The Court: But he did go there with a weapon and with the weapon that it is alleged caused the death of the deceased.     Your statement as to whatever quarrel developed or whatever happened there which led to the death of the decedent, was simply an act on her part of taking the weapon from his inside pocket.''

Subsequently the proffered proof of the threat made by the deceased was admitted in evidence, and the witness upon the stand, in answer to proper questions, testified in effect that the deceased had said to her that if the defendant married the Italian girl she would kill him.

The comments of the trial judge made in the foregoing excerpt from the record, wherein he belittled the effect of the proffered testimony, and discredited the defendant's plea of self-defense, were so obviously improper that nothing can be said in justification of them. The attorney-general on behalf of the people does not attempt a justification of the objectionable comments, nor is it contended that they did not seriously prejudice the defendant and damage his defense in the eyes of the jury; but it is contended that such injury and damage were cured and corrected by the special charge of the trial court given to the jury upon the conclusion of the argument upon the admissibility of the evidence in question, and that therefore the defendant now has no cause for complaint.

We cannot agree with this contention; and in failing to do so we have in mind the rule that ordinarily an admonition of the trial judge to the jury to disregard misconduct of either the judge or district attorney will, in the absence of an affirmative showing of injury, suffice to remove any prejudice resulting therefrom in the minds of the jury. The rule in this behalf is founded upon the presumption that the jury will heed the admonition of the trial judge; but we do not understand that that presumption prevails in the presence of an impropriety upon the part of the trial judge such as is presented for review in the present case; which in its very nature was calculated to weaken, if not utterly destroy, a legitimate and substantial defense apparently interposed in good faith. That such was the tendency of the comments complained of there can be no doubt. The declaration of the trial judge that the claim that the deceased took the dagger from the defendant's person was "an absurdity" expressed the opinion of the trial judge, as clearly and as convincingly as the English language could express it, that the defendant's plea of self-defense was founded in falsehood; and the trial judge's characterization of the threat relied upon to support that defense as "a mere idle statement made by the deceased" could have had no other

effect in the minds of the jury than to seriously impair, if not utterly destroy, the probative value and effect of the evidence subsequently offered and admitted to establish a material fact in the defendant's favor.

In the case of *People* v. *Conboy*, 15 Cal. App. 97, [113 Pac. 703], this court reiterated and reaffirmed the doctrine enunciated by the supreme court of Alabama (*Hair* v. *Little,* 28 Ala. 236), that "it is of the highest importance in the administration of justice that the court should never invade the province of the jury; should give them no intimation as to its opinion upon the facts; but should leave them wholly unbiased by any such intimation to ascertain the facts for themselves." When we stop to consider that "from the high and authoritative position of a judge presiding at the trial before a jury his influence over them is of vast moment" (*McMinn* v. *Whelan,* 27 Cal. 300, 319), and "that juries, especially in cases which are strongly litigated upon the facts, watch with anxiety to gather from the court some intimation as to what their findings should be upon the facts" (*Hair* v. *Little,* 28 Ala. 236), and "the readiness with which a jury frequently catches at intimations of the court, and the great deference which they pay to the opinions and suggestions of the presiding judge in closely balanced cases" (*People* v. *Williams,* 17 Cal. 142, 147), we cannot conceive that the comments complained of in the present case, although addressed to the counsel for the defendant, did not have the effect of irresistibly and indelibly impressing upon the minds of the jury the belief that it was the opinion of the trial court that the defendant was guilty as charged. It is idle to argue, and it would be bordering upon the ridiculous for this or any other court to say that because the objectionable remarks of the trial judge were not addressed directly to the jury, it must be presumed that the jury ignored them. It was but natural for the jury to listen to and become interested in the discussion between court and counsel, and any presumption to the contrary would do violence to the every-day experience and observation of lawyer and layman alike.

As was said in the case of *State* v. *Harkin,* 7 Nev. 377: "It is evident that the opinion of the court can be as effectively conveyed to the jury by expressing it in their hearing while ruling upon an objection to the evidence, as by embodying

it in what purports to be a declaration of law for their guidance. . . . The right to a decision on the facts uninfluenced and unbiased by the opinions of the judge has been deemed worthy of a constitutional guaranty. It cannot be lawfully denied by the simple evasion of looking at counsel instead of the jury, or of foisting the opinion into a ruling upon the testimony.''

To permit the trial judge to say in the presence of the jury, under the guise of a ruling upon the admissibility of evidence, that which the constitution prohibits him from saying directly to the jury, would be to put the seal of approval upon a mere subterfuge of which it has been said that ''the wit of man could scarcely devise a more palpable violation of that provision of our organic and statute law which prohibits judges from charging juries in respect to matters of fact.'' (*State* v. *Harkin,* 7 Nev. 377.)

Of what avail, then, was it for the trial judge to say to the jury, ''I want you gentlemen to understand that in all this discussion there is no intent upon the part of the court to show his belief in the testimony, either the truth or the falsity of it; nor does the court intimate any personal view as to the value of the testimony, or of the claim made by counsel of the defendant of the state''? Manifestly, this was not a retraction of the previous remarks of the trial judge which indicated that he was strongly of the opinion that the defendant's defense of self-defense was a preposterous fabrication, and that the proof proffered in support thereof was puerile. At best the trial judge did no more than to disclaim that he had expressed or intended to express an opinion upon the merits of the case; but the verity of the disclaimer was impugned by the fact that he had actually and emphatically expressed an opinion upon the most vital facts of the defendant's case. The fact that such opinion may have been unintentionally expressed did not tend to lessen its weight with the jury, and consequently it cannot be said that the charges in question sufficed to efface the prejudicial effect of the opinion. (*People* v. *Willard,* 92 Cal. 482, 489, [28 Pac. 585]; *People* v. *Kindleberger,* 100 Cal. 367, [34 Pac. 852]; *People* v. *Chew Sing Wing,* 88 Cal. 268, 272, [25 Pac. 1099]; *People* v. *Conboy,* 15 Cal. App. 97, [113 Pac. 703].)

29 Cal. App.—**47**

A letter addressed to the deceased, and purporting to have been written by her husband, was offered in evidence by the district attorney. When the letter was first offered in evidence objection was made upon behalf of the defendant that it was hearsay, etc., whereupon the trial court, upon its own motion, read the letter, and then expressed doubt as to its admissibility. Thereupon the district attorney withdrew his offer to put the letter in evidence, but later on in the course of the trial he made another effort to get the letter in evidence, and notwithstanding the fact that the court had previously read the same, stated its contents to the court in the presence and hearing of the jury.

The evidence sought to be shown by the letter was clearly incompetent, and the trial court finally so ruled. The effect of the action of the district attorney in stating the contents of the letter was to anticipate an adverse ruling, and thereby indirectly to get before the jury that which he was not permitted by the law to put directly in evidence. Counsel for the defendant promptly objected to this procedure, but the trial court, instead of condemning it, commended the district attorney by assuring him that he had "a perfect right to make his offer," notwithstanding the fact that the court was already fully informed of the contents of the letter. In view of the attitude of the trial court, it would have been useless to request that the jury be admonished not to pay any heed to the statement of the district attorney. Although we are not convinced that the course pursued by the district attorney contributed materially to the verdict, nevertheless it was an irregularity which should not be permitted to pass unnoticed; for, as was said in the case of *People* v. *Lee Chuck*, 78 Cal. 317, [20 Pac. 719]) : "Equally with the court the district attorney, as the representative of law and justice, should be fair and impartial. . . . We make due allowance for the zeal which is the natural result of such a battle as this, and the desire of every lawyer to win his case, but this should be overcome by the conscientious desire of a sworn officer of the court to do his duty and not go beyond it."

At the request of the prosecution the trial court in effect charged the jury not to consider the alleged threat of the deceased to kill the defendant unless that fact had been established in evidence beyond all reasonable doubt. This instruction was clearly erroneous. The defendant in a criminal

case is not required to establish a fact in his favor beyond a reasonable doubt. It is the settled rule that such fact need be proved only by a preponderance of the evidence. (*People* v. *Coffman,* 24 Cal. 230, 236; *People* v. *Mitchell,* 63 Cal. 480; *People* v. *Miller,* 171 Cal. 649, [154 Pac. 468].)

Under the circumstances of the present case the fact that the deceased had threatened to take the life of the defendant was a most material fact in his favor; and we have no doubt but that the instruction complained of, considered in connection with the previous misconduct of the trial judge, resulted in substantial prejudice to the defendant. The effect of such misconduct was, as previously pointed out, to cripple the evidence of the threat, and the effect of the erroneous instruction under consideration was practically to debar the jury from considering that evidence at all.

We have painstakingly examined the evidence produced upon the whole case in an endeavor to sustain the judgment upon the theory that, notwithstanding the errors and irregularities complained of, the conviction of the defendant was not a miscarriage of justice. We cannot conscientiously come to any such conclusion. As we have previously stated, the defense interposed upon behalf of the defendant was, so far as the record before us discloses, a substantial one, and apparently advanced in good faith, and supported by evidence, direct and circumstantial, which merited the serious and unbiased consideration of the jury. On the other hand, the theory of the prosecution that the motive for the killing was not as the defendant claimed, but was to be found in the fact that the deceased rejected the advances of the defendant, was rested, in so far as we have been able to ascertain from the record, largely, if not entirely, upon proof of the fact that upon one occasion the deceased had publicly repulsed and repudiated the defendant.

We do not wish to be understood as intimating that if the defendant had been given a fair trial in accord with the settled and generally well-understood procedure provided by the law, the evidence adduced upon the whole case would not have supported the verdict and judgment. All that we mean to say in this behalf is that we are convinced that the error of the instruction complained of, coupled with the objectionable comments of the trial judge, operated to prevent

the jury from giving that fair and impartial consideration to all of the evidence which the law demands before a verdict can be rightfully reached.

The judgment and order appealed from are reversed.

Kerrigan, J., and Richards, J., concurred.