[Crim. No. 5486. In Bank. Feb. 1, 1955.]

THE PEOPLE, Respondent, v. EUGENE BURWELL et al., Appellants.

Adams & Reynolds, John Adams, Jr., and R. J. Reynolds for Appellant Burwell.

Walter F. Freitas and S. J. Hugh Allen, appointed by the Supreme Court, for Appellant Rogers.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, Arlo E. Smith, Deputy Attorney General, and W. O. Weissich, District Attorney (Marin) for Respondent.

SHENK, J.—Eugene Burwell and James A. Rogers, inmates of the state prison at San Quentin, were charged with murdering two San Quentin guards, Charles W. Wiget and Vern A. Mackin. Verdicts of conviction without recommendation as to penalty were returned by the jury and death sentences were imposed. There is here an appeal from the judgment of conviction and from an order denying a motion for a new trial as to each defendant.

The defendant Burwell was the chief clerk of the library in the main prison or so-called "Quentin side" thereof. Burwell's friend, the defendant Rogers, lived in the so-called "Guidance Center side" of the prison awaiting assignment to his place in routine prison life, and his opportunities to visit Burwell were limited. On January 14, 1952, in violation of prison rules, Rogers exchanged clothes, identification cards and cells with Bragg, an inmate quartered in the main prison. Bragg was entitled to leave his cell for certain purposes between the hours of 6 and 8 p. m. On or about 6:30 p. m. of that evening Rogers posing as Bragg, met Burwell at the prison library where the latter was on duty. The only other occupant of the library at the time was inmate Wolfe, an assistant clerk at work in the librarian's office. The evidence of what took place thereafter is conflicting, but viewed in a light consistent with the verdicts, as we are required to do (*People* v. *Daugherty,* 40 Cal.2d 876, 885 [256 P.2d 911] ; *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778] ; *People* v. *Perkins,* 8 Cal.2d 502, 510 [66 P.2d 631] ; *People* v. *Tom Woo,* 181 Cal. 315, 326 [184 P. 389]), there is substantial evidence from which the jury reasonably could find that the defendants planned an escape; that the defendant Burwell and Officer Wiget were unfriendly due to a prior disagreement and altercation; that as a result thereof the defendant Burwell planned "to get" Officer Wiget; that the officer's visit to the library on a regular tour of duty was anticipated by the defendants and they planned to attack him; that weapons consisting of two knives,

the separated blades of a pair of scissors and a hand axe were collected in anticipation of the attack; that at approximately 7:10 p. m. Officer Wiget knocked on the library door and was admitted by Burwell; that Rogers pretended to be ill as he lay on a table in a rear room off the main library reading room; that Officer Wiget first questioned Rogers' right to be in the library; that as he attempted to diagnose Rogers' trouble and to make an entry in his notebook, he was attacked by the defendants using the weapons theretofore concealed, and that in the ensuing struggle Wiget was killed. His death was attributed to multiple injuries, the main causes being a stab wound penetrating the chest and abdomen, and partial asphyxia due to compression from a necktie drawn tightly about his neck following the struggle. During the assault on Wiget, Burwell received a stab wound through his back and into his chest cavity. The wound was dressed by Rogers and external bleeding temporarily ceased.

Thereafter the defendants bound and gagged inmate Wolfe and placed him in a position not visible from the main library or the scene of the homicide. They dragged Officer Wiget's body into a small stockroom off the rear reading room. Defendant Burwell went into the corridor outside of the main library where he engaged in conversation with two prison guards, Officers Dascombe and Stewart. He informed these guards that Rogers was ill in the rear reading room and the officers accompanied Burwell to that room. Officer Dascombe left to obtain a hospital gurney to remove the supposedly ailing Rogers. As Officer Stewart bent over Rogers in an effort to make him more comfortable he was struck repeatedly from behind by Burwell using the hand axe. Rogers joined in the assault with a scissors blade. The officer fell to the floor, where he remained for an indeterminate time. During that time Officer Dascombe returned. He could not or did not see Officer Stewart. The defendant Rogers was lying on a library table when Officer Dascombe reentered and was assisted by the officer in arising. The officer noticed a blade from a separated pair of scissors in Rogers' trousers pocket and relieved him of it. Rogers was ordered to leave the library, but instead Rogers seized a broom and he and Officer Dascombe fought for possession of it. While this struggle was in progress, the defendant Burwell attacked Officer Dascombe from behind again, using the hand axe to beat the officer into unconsciousness. Meanwhile Officer Stewart had arisen and escaped from the library.

Both of the officers suffered extensive multiple fractures of their skulls and mangled hands and fingers in attempting to ward off the blows from the axe. They both recovered.

Leaving the unconscious Dascombe and the body of Wiget in the library, the defendants sought an escape route. They proceeded through a mess hall in which a basketball game was in progress and met Officer Vern A. Mackin, who inquired as to their destination. They stated that they were bound for a projection booth overlooking the mess hall to obtain certain phonograph records for use in the library. Officer Mackin accompanied them to the projection booth, where inmate Gallegos was on duty playing musical recordings during the intermission of the basketball game. Mackin advised Gallegos of Burwell's and Rogers' purported purpose in coming to the booth. Mackin then noticed something amiss in the defendants' appearance and conduct and sought to summon aid by telephone. Rogers thereupon seized Mackin around the neck from behind. Gallegos attempted to assist Mackin but was unable to break Rogers' hold on Mackin. Rogers drew a knife and Burwell took the hand axe from his clothing and both assaulted Mackin with these weapons in such a manner as to cause his death. Gallegos escaped and gave the alarm that resulted in the apprehension of the defendants. Mackin's death was attributed to multiple injuries, the main cause being a stab wound directly into the heart, fractures of the skull and concussion of the brain.

Evidence from which the foregoing account of the events which took place relating to the homicides in large part came from statements made by the defendants during preliminary investigations. The account to which they testified during the trial conflicts in some details with the recitation of facts set forth above, particularly with reference to the events leading up to the death of Officer Wiget who, they claim, launched an attack upon Burwell who, in turn, acted in self-defense. ■ However, in view of the conflict in the evidence the jury was not required to believe the defendants' different versions of the killings. (*People* v. *Borrego,* 211 Cal. 759, 765 [297 P. 17]; *People* v. *Shafer,* 101 Cal. App.2d 54, 59 [224 P.2d 778].) There is substantial evidence to sustain the verdicts that each defendant participated in both killings and that the homicides were murders in the first degree. (Pen. Code, § 189.)

A preliminary question relates to the defendants' contention that they were denied a fair trial by the refusal of the

court to continue the trial until after a decision in a collateral mandamus proceeding, hereinafter referred to, involving the right of the defendants to inspect certain records taken from the files of the coroner's office at the direction of the district attorney. The record shows that about a month after the homicides the court-appointed attorneys for Rogers asked the Marin County coroner to permit them to look at his file in the case. The coroner stated that he would have to secure the consent of the district attorney before he would allow them to do so. After two telephone conversations, the district attorney consented to the inspection of the file. It was about 5 o'clock in the afternoon when this consent was secured, and the attorneys, after thumbing through the file, indicated that they would continue their inspection the following morning in order not to inconvenience the coroner. In their brief inspection the attorneys noticed that the file contained copies of San Quentin inspection reports, psychiatric reports, interrogations of both defendants, autopsy reports, personal property reports, pictures and other data concerning the homicides. When the attorneys returned to the coroner's office the next morning they were informed that the district attorney had directed that all material other than the coroner's report and the personal property report be turned over to his office, and that the coroner had complied with his request. The attorneys for Rogers then sought in the superior court a writ of mandamus to compel the production of material taken by the district attorney from the coroner's file on the ground that this material was part of a public record which the defendants were entitled to examine or that if the material was privileged, the privilege had been waived. Burwell later joined in this proceeding.

A hearing was held in the mandamus proceeding in the superior court. The coroner testified that the material taken by the district attorney in general consisted of San Quentin reports about the defendants and the killings; that he had requested copies of these reports from the warden; that they had been given to him with the understanding that the information contained therein was to be kept confidential until otherwise specified by the warden; and that he, as coroner, had read these reports and looked at pictures included in this material in determining whether or not to hold an inquest. The district attorney testified that the disputed material consisted of ''unsworn summaries and statements from prison officials, employees and inmates, and photographs

taken by prison personnel.'' He did not produce this material for examination by the trial court or relate more precisely the nature of its contents. At the conclusion of the hearing the superior court granted a writ only as to the papers containing answers to questions by the defendants. The district attorney and coroner appealed from the order which had the effect of staying the issuance of the writ; Rogers also appealed seeking to have the order broadened to include all of the papers removed from the coroner's file.

While the mandamus proceeding was pending in the District Court of Appeal and a few weeks prior to trial, the defendants moved for a continuance until the appellate court should determine the appeals. The judge who ruled upon this motion considered the record of the mandamus proceeding, which had been introduced in evidence. He stated that unless the district attorney delivered to the defendants the material ordered to be disclosed by the writ of mandamus he would grant the motion for a continuance. The defendants argued that a continuance should be granted until their appeal was ruled upon because the material which would not be turned over to them by the district attorney was necessary to their defense. The district attorney agreed to deliver the papers provided for in the writ of mandamus and the motion for continuance was denied. The case went to trial about 10 days later.

After the verdicts were returned the defendants made motions in arrest of judgment, for a new trial, and for a 60-day continuance before sentence was pronounced in order to await the decision of the District Court of Appeal in the collateral mandamus proceeding then pending. The trial court granted the 60-day continuance. The district attorney sought a writ of mandamus to compel the superior court to pronounce sentence immediately. This was denied by the District Court of Appeal. The district attorney then made the remaining material from the file available for examination by the defendants and moved to dismiss the defendants' appeal in the mandamus proceeding on the ground that it was moot. The District Court of Appeal dismissed the appeal on that ground. This court denied a petition for hearing.

It is urged by the defendants that their appeal in the mandamus proceeding was improperly dismissed by the District Court of Appeal and that they are entitled to a determination of the merits on this appeal. It was stipu-

lated that the record in the mandamus proceeding become a part of the record in the present proceeding. Assuming that this question is still open on this appeal it is clear that the defendants must show more than a bare right to have had access to the additional material in the coroner's file prior to the commencement of the trial. They must show on this appeal that withholding the material resulted to their prejudice or that earlier access to the material would have been of some advantage to them. They were granted access to it prior to the motions for a new trial and neither there nor here have they shown that the claimed wrongful withholding of information was to their disadvantage either as a denial of a fundamental right resulting in an unfair trial, or as a miscarriage of justice.

The statement is made that the effect of the actions of a state through its officials which have been held to result in a denial of due process to one subjected to criminal prosecution has, in late years, through judicial decision, been materially enlarged upon. It is stated that convictions cannot be brought about by a method that "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." (*Brown* v. *Mississippi*, 297 U.S. 278, 285 [56 S.Ct. 461, 80 L.Ed. 682] quoting from *Snyder* v. *Massachusetts*, 291 U.S. 97, 105 [54 S.Ct. 330, 78 L.Ed. 674, 90 A.L.R. 575].) The acts which have been held improper are those which truly have offended a sense of justice such as the denial of counsel (*Powell* v. *Alabama*, 287 U.S. 45 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527]), trial by mob domination (*Moore* v. *Dempsey*, 261 U.S. 86 [43 S.Ct. 265, 67 L.Ed. 543]), confessions extorted by torture (*Brown* v. *Mississippi, supra*, 297 U.S. 278), and other acts of a similar nature. In the present case the state did not act outside the realm of established judicial procedure. (See *Snyder* v. *Massachusetts, supra*, 291 U.S. 97; *Rogers* v. *Peck*, 199 U.S. 425, 434 [26 S.Ct. 87, 50 L.Ed. 256].) The evidence was withheld under a claim of right supported by a judicial decision rendered in good faith by a competent court. The constitutional guaranties and prohibitions are not such as to require pretrial cooperation in a criminal case. (See *Stroble* v. *California*, 343 U.S. 181 at p. 197 [72 S.Ct. 599, 96 L.Ed. 872].) The defendants were given adequate notice of the charges against them, a reasonable opportunity in which to prepare their defense against those charges, and an opportunity to be heard and present in court

such evidence as they desired. The action of the state involved here is far removed from the type of action denounced in the cited cases.

The claim of reversible error in denying motions for a continuance, for a new trial and in arrest of judgment pending final determination of the mandamus proceeding must rest upon, among other things, a showing that had the additional information been sooner disclosed the defendants might have been able to present a more effective defense. In this connection they contend that the material made available to them prior to the trial did not include the necktie found tightly knotted about the neck of Officer Wiget after his body was discovered and claimed by the prosecution to have been used as one of the instrumentalities in causing his death. This item of evidence, the defendants claim, was important on the issue of premeditation and deliberation necessary to constitute the killing of Officer Wiget the offense of murder in the first degree. (Pen. Code, § 189.) The record reveals that in the closing arguments to the jury the district attorney pointed to the testimony regarding the asphyxia caused by knotting the necktie about the neck after Wiget was rendered helpless as refuting the defendants' claim of self-defense against Wiget's assault. But this is not the only evidence of premeditation and deliberation, nor was it particularly relied upon in the prosecution's closing arguments. There was other pertinent evidence which may be deemed to be more conclusive on the point of premeditation and deliberation. Furthermore, the defense attorneys had ample reason to believe that the necktie would be referred to during the trial. The material in the coroner's files which was made available to them before trial revealed that in interrogations before trial the prosecution showed an interest in the possible use of the necktie as evidence. During the trial the defense attorneys cross-examined extensively the prosecution witnesses who testified as to the asphyxia which might have been caused by the tightly knotted necktie.

There is no showing, and it does not appear, that the defendants might have prepared any defenses to refute the effect of the introduction of this evidence other than those interposed. They claim that they might have obtained finger-print data from the tie which would have aided their cause, but there is nothing in the record nor in reason to support such a claim. The prosecution was not required to lay out for the defendants its order of proof and the fact

that it emphasized the inferences to be drawn from the testimony relating to the necktie at a time which the defendants claim was ''strategic'' indicates only that the prosecution was presenting its evidence in a manner deemed by it to be most effective.

Other material claimed to be wrongfully withheld were lists of persons who might have some knowledge of the circumstances attending the killings but who were not called upon to testify. The defendants argue that such witnesses would testify favorably to the defense. But they fail to show what such testimony might be. Furthermore they had access to all the withheld material before motions for a new trial. They failed to show on those motions, as they have failed to show on this appeal, that an inspection of the material in question before trial would have been to their advantage.

The defendants moved for a change of venue on the ground that they could not have a fair trial in Marin County. They assign as error the court's denial of their motions. At the hearing on the motions they introduced evidence to the effect that after Officers Mackin and Wiget were killed a fund was set up for their families; that solicitors with collection boxes were placed in many public places and in stores throughout the county; that $8,271.83 was collected, mainly in small contributions, and that a benefit dance was held, the proceeds of which went into the fund. The foregoing in itself does not indicate any prejudice towards the defendants, but rather an expression of sympathy on the part of the people of the community in which the families of the deceased guards were living. Other evidence, consisting mainly of published newspaper articles, was claimed to indicate prejudice.

In opposition to the motions for change of venue, the People submitted affidavits which contradicted the assertions of the defendants. An affidavit made by the editor of one of the leading newspapers of the county averred that he was generally cognizant of news coverage and public opinion throughout the county; that his newspaper and others gave no more coverage than customary for an event of such importance; that in his opinion the newspaper accounts did not result in undue prejudice; that over four months had elapsed since the homicides; that the average person was no longer concerned with the events which took place, and that there was no recognizable bias or prejudice against either defendant within the county. It was further averred that

the people of Marin County understood the problems associated with a prison and their sympathy and understanding had been expressed by prior acquittals of inmates alleged to have committed crimes within the prison walls. An affidavit of a deputy district attorney averred that a survey had been conducted to determine whether there was a general prejudice against the defendants, and that the result of the survey clearly indicated that the defendants would receive a fair trial in Marin County.

The trial judge, in denying the motions for change of venue, stated: ''I have had a great deal of experience also with the people of Marin County as a public in connection with their tendency or lack of tendency to be stampeded. I was born here and have seen these things happen all my life, not often, but some of these things at San Quentin and it seems . . . there is no tendency towards prejudice in a matter of this kind.'' ■ A motion for change of venue is directed to the sound discretion of the trial court (*People* v. *Cullen,* 37 Cal.2d 614, 627 [234 P.2d 1] ; *People* v. *McKay,* 37 Cal.2d 792, 793 [236 P.2d 145]), and no abuse of that discretion has been shown.

A portion of the People's evidence consisted of statements made by the defendants immediately after their apprehension. The defendants assert that the circumstances under which such statements were made showed that they should have been excluded. (See *People* v. *Jones,* 24 Cal.2d 601 [150 P.2d 801] ; *People* v. *Rogers,* 22 Cal.2d 787 [141 P.2d 722].) There is a conflict in the evidence as to what mistreatment, if any, the defendants were subjected to before making any statements. ■ The attendant circumstances which go to the free and voluntary nature of such statements are preliminary questions for the court and finally questions of fact for the jury under proper instructions. (*People* v. *Fox,* 25 Cal.2d 330, 340 [153 P.2d 729].) ■ When the question has been resolved against the defendants, the determination will not be disturbed unless it is without sufficient evidentiary support. (*People* v. *Mehaffey,* 32 Cal.2d 535, 554 [197 P.2d 12].) It appears that after their apprehension in the projection booth, the defendants were both ordered to take off their clothing, including their shoes. Both defendants had carried weapons concealed in their clothing into the projection booth and Rogers was carrying a concealed weapon as he left the booth after Officer Mackin's death. The clothing of both defendants was heavily covered with blood. The People

contended that the clothing was removed for evidentiary purposes and to make certain that no other weapons were concealed upon the defendants' persons. The defendants were then marched into and across a prison yard to a captain's office, where the questioning complained of took place. During the journey Burwell lagged behind, and was told to quicken his pace. He replied that he was in "no hurry." Upon a second refusal to respond to an order to move faster, one of the guards twisted his arm behind his back and hurried him along. Another guard struck Burwell across the back and buttocks with a night stick to speed him along.

During the apprehension and questioning to follow, Burwell was suffering from the wound in his back which had been temporarily treated by Rogers in the library. Following a coughing spell while Burwell was being questioned in the captain's office, the wound reopened. Questioning ceased at this point and Burwell was given immediate medical attention. He was not questioned further until the following morning.

It is apparent that some force was used in producing the defendants at the captain's office. There were 250 inmates in the vicinity of the area through which the defendants were marched, a basketball game having been in progress. The officer in charge at the time, who admitted using force to hurry Burwell along, was concerned whether the violence which had resulted in the homicides was an outgrowth of a planned general prison break and he was not certain of the reaction of the other inmates to the apprehension of Burwell and Rogers. It was the duty of the guards to take the defendants across the yard without delay. It is difficult for a court to say how much force was necessary. Under the circumstances here disclosed it may not be said that more force was used than was necessary. A display of force in effecting an arrest has been held not to affect a confession subsequently made. (*Connors* v. *State,* 95 Wis. 77 [69 N.W. 981]; *Roman* v. *State,* 23 Ariz. 67 [201 P. 551].) There is no evidence of undue discomfort suffered by the defendants on their way to the captain's office and no evidence of threats, or duress, after they arrived there.

The test in determining whether statements amounting to a confession may be properly admitted in evidence without a denial of fundamental rights appears, by the latest expression of the Supreme Court, to be one of trustworthiness.

(*Stein* v. *New York* (1952), 346 U.S. 156 [73 S.Ct. 1077, 97 L.Ed. 1522].)

There is substantial evidence in the record upon which the trial court and the jury reasonably could conclude, as it did, that all of the statements or confessions to which the defendants object were made freely and voluntarily, were not given under threat or promise, were not coerced in any manner and indicated trustworthiness. Although Burwell had sustained some injury he nevertheless answered the questions asked of him in a manner which indicated that he had full control of his faculties. On the following morning he gave substantially the same answers when questioned by the district attorney. Immediately after questioning in the captain's office the chief medical officer of the prison examined him and later testified that he was in good physical condition; that his pulse and blood pressure were "practically normal"; that he was not suffering from shock, and that his responses to questions were logical and prompt.

The defendants contend that they were denied a fair trial because of the manner in which they were conducted to and from the courtroom and the circumstances under which their testimony was taken. The defendants were transported from San Quentin Prison to the court each day of the trial in a station wagon. Their hands were handcuffed to their belts and they were restrained by a short length of chain held from behind by one of the prison guards. These security measures were the usual practice of the Department of Corrections whenever an inmate was brought from the prison to the courthouse. No formal protest to this practice was made by the defendants during the trial. After they entered the courtroom the restraining devices were removed but an armed guard was stationed in an anteroom behind the bench and witness chair. This anteroom led to a doorway from which egress from the courtroom might be made. While the defendants were in the witness chair, the guard removed his gun from its holster but did not make any gestures toward them. This precaution was deemed necessary because of the close proximity of the witness chair to the doorway. The guards were not visible to the defendants while they testified, nor to the jury at that time.

When reasonable precautions are taken to retain custody of an accused the fact that they bring before the jury the information that a defendant is a convict and perhaps a dangerous character does not deprive him of a fair trial.

(*People* v. *Kimball*, 5 Cal.2d 608, 611 [55 P.2d 483]; *People* v. *Metzger*, 143 Cal. 447 [77 P. 155]; *People* v. *Harris*, 98 Cal.App.2d 662, 665 [220 P.2d 812].) ■ The defendants in the present case were in prison after conviction of crimes of violence, and were at the time accused of killing two prison guards and severely injuring two others. Furthermore, letters written by the defendant Burwell showed that he planned an escape from the courtroom with the aid of friends and with two revolvers which he intended to procure if he could through a guard he thought to be friendly. Under these circumstances the precautions taken were reasonable and necessary and the defendants cannot complain of any prejudice which might have resulted therefrom. (See *People* v. *Kimball, supra*, 5 Cal.2d 608, 611.)

The defendants claim that the court erred in permitting the jury to separate and mingle with the spectators during recesses, and that the jury was not adequately admonished prior to recesses and adjournments. These contentions were determined adversely to the defendants on motions for a new trial. ■ The trial court has discretion to permit the jury to separate during recesses and adjournments. (*People* v. *Erno*, 195 Cal. 272 [232 P. 710]; Pen. Code, § 1121.) The record does not show that any objection to this procedure was made by counsel for defendants. Nor is it apparent that any prejudice resulted from the claimed commingling. The affidavits of 10 jurors stated that they did not discuss the case with anyone nor even hear any comments. Another juror averred that when approached by a spectator he walked away and that he did not discuss or overhear comments on the merits of the case. The twelfth juror was unavailable, having left the state.

On eight occasions the court gave the full statutory admonition. (Pen. Code, § 1122.) On other occasions the court gave a permissible short form of admonition. ■ It is claimed that no admonition at all was given on four occasions when recesses were taken. If they were not so given the court's attention was not called to the omission and under these circumstances the irregularity in the proceedings was not such as to require a reversal. (Fricke, *California Criminal Procedure*, 2d ed., p. 250 and cases there cited. See also *Sundahl* v. *State*, 154 Neb. 550 [48 N.W.2d 689]; *Langley* v. *State*, 53 Okla. Crim. 401 [12 P.2d 254, 256].) No abuse of discretion is indicated by the court's denial of the motions for a new trial based on the foregoing contentions.

The defendants claim error in the trial court's rulings on the admissibility and exclusion of evidence and on the scope of cross-examination on occasions too numerous to mention. The trial was no doubt fraught with tense and spirited controversy between counsel. It consumed over seven weeks from the time the jury was sworn until verdicts were returned. There were 114 exhibits and 2,987 pages of reporter's transcript. Objections were vigorously argued. It would serve no useful purpose to set forth in detail each of the points raised. They have been considered and do not require specific discussion except those which relate to: (1) the admission of photographs of the officers who were killed; (2) the admission and exclusion of letters written by Burwell in regard to a planned escape; (3) the scope of cross-examination of character witnesses for the defendant Burwell and, (4) the right of witnesses to refresh their memories by reference to notes before answering questions on examination.

As to point (1) the admission of the photographs was objected to on the ground that as they depicted the condition of the bodies of the dead officers they were presented for no reason other than to prejudice the jury. Of the four exhibits now complained of, objections were not made at the trial as to two of them, a third was admitted over objection and the fourth was refused admission. It is the rule that photographs when relevant to the issue, have evidentiary value. They are often subjected to the objection that they may have a tendency to inflame the jury against the accused. The question of their admissibility is generally within the discretion of the trial court. (*People* v. *Guldbrandsen,* 35 Cal.2d 514, 521-522 [218 P.2d 977].) No abuse of discretion is here shown. (See *People* v. *Osborn,* 37 Cal.2d 380, 383 [231 P.2d 850] ; *People* v. *Guldbrandsen, supra,* 35 Cal.2d 514, 521-522; *People* v. *Dunn,* 29 Cal.2d 654, 659 [177 P.2d 553].)

With reference to point (2) it appears that photostatic copies of letters written by the defendant Burwell, previously referred to, were admitted in evidence over objection. These letters revealed plans for an escape during the trial. Such evidence is admissible to show consciousness of guilt. (*People* v. *Schafer,* 161 Cal. 573, 578 [119 P. 920] ; *People* v. *Arnold,* 199 Cal. 471, 497 [250 P. 168].) To counteract this showing the defendant Burwell attempted to introduce letters written by him to members of his family about four months before the homicides. It was claimed that

they would show that Burwell had no intention at that time nor at the time of the offenses to escape from prison. The offer was rejected, obviously on the ground that the letters were too remote to prove what was in this defendant's mind several months thereafter. No error in this ruling is indicated.

As to point (3) it appears that character witnesses for the defendant Burwell were asked on cross-examination if they had heard of certain instances in which this defendant had not conducted himself in a manner consistent with the character attributed to him by his witnesses. This is proper cross-examination in the absence of a showing of bad faith. (*People* v. *McKenna*, 11 Cal.2d 327, 335 [79 P.2d 1065]; *People* v. *Stevens*, 5 Cal.2d 92, 99 [53 P.2d 133].) This defendant chose to put in issue his reputation for peace and quiet, and the People had the right to counter this showing by evidence indicating an unruly and violent disposition, and to impeach the testimony of his own witnesses. The court properly exercised its discretion in allowing some and rejecting other questions relating to prior misconduct on the part of the defendant. Although specific incidents to which the character witnesses were referred occurred more than four years prior to the homicides, the question of remoteness is within the sound discretion of the trial court and no abuse is here shown. (See *Michelson* v. *United States*, 335 U.S. 469 [69 S.Ct. 213, 93 L.Ed. 168].)

As to point (4) it appears that witnesses for the People, generally those connected with the administration of the prison, were allowed to testify by refreshing their memories from personal notes and records made at the time of or immediately after the incidents to which they related. While recognizing the right generally to so testify (Code Civ. Proc., § 2047), the defendants insist that these witnesses were allowed undue freedom in refreshing their memories. In some instances considerable leeway was allowed in referring to the notes. This was justifiable because the conversations and events which were the subject of examination took place more than seven months prior to the trial and the witnesses were testifying concerning matters which were part of lengthy and detailed official prison records. Section 2047 not only allows a witness to refresh his memory from a writing but also to "testify from such a writing, though he retain no recollection of the particular facts" if such evidence is received with caution. The record shows that the proper cautionary safeguards were observed

and that no error was committed. (See *Anderson* v. *Souza,* 38 Cal.2d 825, 832-833 [243 P.2d 497] ; *People* v. *Zammora,* 66 Cal.App.2d 166, 244 [152 P.2d 180].)

In addition to the foregoing the defendants charge misconduct on the part of the trial court. Complaint is made of certain statements made by the trial judge, and in particular to the following remarks in regard to the death of a 72-year-old juror during the trial: "It might seem perfunctory, perhaps, to the members of the jury that we go on and continue these proceedings with one more tragedy added to the list involved, but all we can do is carry on without him. I had no particular opportunity, because of the nature of these proceedings, to know Mr. Hirschfield, but I did speak to him briefly on two or three occasions and learned perhaps something of what you ladies and gentlemen had learned perhaps in your direct association during the past two months. You are the ones, I think, actually qualified to speak for him. It seemed to me he had become your pet already, and I could see why, in the few conversations which I had with him that would be so. Counsel, of course, due to the nature of the matters here, have had no opportunity whatsoever to see those things except from afar, but I think it was appropriate for you gentlemen to move that the court be adjourned today out of respect to his memory and that will be the order."

The defendants have drawn the unfounded conclusion that by the phrase "one more tragedy added to the list involved," the judge was relaying to the jury his feeling that the defendants were responsible for the death of the juror and the two guards. There is no question but that the events which had occurred could properly be termed "tragedies" and in so referring to them there was no imputation of fault or responsibility chargeable to the defendants.

Near the close of the prosecution's case the judge made the following inquiry of counsel: "I should like to ask you gentlemen if it is possible to give any estimate as to the additional length of this trial. I think a good many people connected with the case, jurors and others, have postponed or gone without vacations on account of this matter, and they would perhaps like to know when they can start one or attend to some other affairs. I have an estimate from the defendants, and if the District Attorney would rather not give an estimate separately I would like to have you get together and see if you can come to some kind of an arrange-

ment so that I can give it to the Jury before they leave tonight.''

The foregoing statement is assigned by the defendants as misconduct because, it is asserted, the judge indicated that the result of the trial was a foregone conclusion and that all parties should hasten to accomplish that result. Such an inference cannot reasonably be drawn from the statement. If it is to be construed as a criticism of the undue length of the trial it probably should be ascribed to the prosecution since its case was still in progress. Such admonitions have been held not to be prejudicial when, as here, there was no purpose to divert the course of a trial from its orderly progress. (*People* v. *Williams,* 32 Cal.2d 78 [195 P.2d 393].)

On another occasion the trial court gave the following instructions to the jury prior to the reading of a written statement attributed to the defendant Burwell: ''The voluntary nature of the confession is at issue; the jury will disregard the expression 'confession'; it is up to the jury to determine whether or not there was one. . . .'' The defendants assert as error the reference to the statement as a ''confession'' as a predetermination of an issue to be decided by the jury. But the court immediately corrected what appeared to it to be a poor selection of a word. No objection was raised at the time and it was not incumbent upon the court to make a more elaborate statement to the jury on the subject. (*People* v. *Avery,* 35 Cal.2d 487, 493 [218 P.2d 527, 21 A.L.R.2d 639].) It does not appear that the defendants were prejudiced by the statement.

The conduct of the district attorney and of his chief deputy is attacked as constituting such misconduct as to deny to the defendants a fair trial. The asserted instances are not serious as to any particular item, but it is argued that their cumulative effect requires a reversal. The following are assigned as misconduct: (a) persistence in asking leading questions despite continued admonitions from the court, sometimes on its own initiative, to refrain from doing so—but all objections properly made were sustained; (b) continued questioning of witnesses who could not testify without refreshing their memories from memoranda—but the procedure outlined in section 2047 of the Code of Civil Procedure was complied with; (c) attempts to introduce pictures with the objective, it is claimed, to inflame the minds of the jurors—but improper pictures were not admitted, nor did the jurors have any opportunity to view

them (*cf. People* v. *Whitacre,* 79 Cal.App. 27, 32 [248 P. 924]); (d) an attempt to introduce a newspaper clipping found in Rogers' pocket—but the contents of the article were not disclosed to the jurors (*cf. People* v. *Pitisci,* 29 Cal.App. 727, 738 [157 P. 502]); (e) the suppression, prior to their introduction in evidence at the trial, of certain items of evidence, in particular the necktie and clothes of the defendants, which, it is claimed, came as a surprise to the defendants during the trial—but it is reasonable to assume that the existence of such evidence was known to the defendants from the time of the homicides; (f) demonstrations before the jury, using items of physical evidence to show the probable manner in which events had occurred—but these were reasonable illustrations based on evidence in the record; and (g) the claimed lack of scientific tests or the introduction of the results of such tests—but it is not shown that such evidence existed.

It is clear, beyond legitimate controversy, that the foregoing instances of asserted misconduct do not, whether considered singly or collectively, constitute that degree of misconduct by a district attorney as would deprive a defendant of a fair trial. If they were misconduct at all it could not be reasonably concluded that they resulted in a miscarriage of justice.

 It is further contended that the prosecuting attorneys improperly led the jury to believe that they were possessed of incriminating evidence not in the record. Both attorneys were witnesses for the People, testifying to the contents of extrajudicial statements made by the defendants. This in itself was not improper. A district attorney is not precluded from testifying as to material facts within his knowledge. (*People* v. *Hamberg,* 84 Cal. 468, 473 [24 P. 298].) In their arguments to the jury on other matters both prosecutors stated that they knew certain events had happened in particular ways, and it is argued that the implication is that the prosecuting attorneys knew such facts from first hand information. However, the context of the arguments referred to indicates that the word "knew" was used in the sense that "the evidence establishes." Care was taken by counsel and the court to make certain that the prosecuting attorneys did not argue in regard to the implications which could have been drawn from events to which they had personally testified. In *People* v. *Owens,* 11 Cal. App.2d 724 at page 727 [54 P.2d 728], the court rejected

a similar contention based upon the same reasoning. ▮ It appears that the prosecuting attorneys made other arguments to the jury in which they stated that certain facts had taken place in their presence. In all of these instances the events referred to had otherwise been properly put in evidence at the trial. In recounting what had occurred, counsel spoke in the first person, giving his version thereof. This was not proper, but in all of the instances to which the defendants object, counsel's version varied but slightly from the testimony otherwise developed, and references were made only as to inconsequential events. They consisted of what took place in posing the defendant Rogers for a newspaper photograph in which he was shown pointing to one of the weapons used by the defendants; of why the officer whose tour of duty Officer Wiget had taken on the night of the homicide was not able to work that evening; of minor details relating to a visit to Mrs. Wiget in seeking an exemplar of her husband's handwriting; of why the district attorney interrogated the defendants before trial, and of matters of similar nature. There is nothing in these remarks that could have prejudiced the defendants within the rule that it is prejudicial misconduct for a prosecuting attorney to base his argument on facts not in evidence. (See *People* v. *Kirkes,* 39 Cal.2d 719, 723 [249 P.2d 1]; *People* v. *Evans,* 39 Cal.2d 242, 251 [246 P.2d 636].)

▮ The defendants complain of statements relating to the prosecution's theory of the manner in which the homicides were committed. To the extent that these theories were based on reasonable interpretations of evidence properly in the record no just criticism may be made. (*People* v. *Sieber,* 201 Cal. 341, 356 [257 P. 64]; *People* v. *Kelly,* 69 Cal.App. 558 [231 P. 767]; *People* v. *Bracklis,* 54 Cal.App. 40 [200 P. 1062].) Thus the defendants object, but improperly so, to the district attorney's conclusions that the purpose for which various weapons were collected by the defendants was to commit a planned assault; that the killing of Officer Wiget was brought about by decoying him into a position in which he was attacked in the same manner as Officers Dascombe and Stewart were attacked; that the wounds received by Officer Wiget and Burwell occurred in a particular manner after Officer Wiget was attacked; that the defendants tightened Officer Wiget's tie about his neck while he was still alive; that the homicides were planned, and that they constituted murders of the first degree. ▮ The prose-

cutor has a wide range in which to state his views as to what the evidence shows and as to conclusions to be drawn therefrom. (*People* v. *Sieber, supra,* 201 Cal. 341, 356.) The foregoing does not show an overstepping of the bounds.

Descriptive references to the defendants made by the prosecutors are claimed to have been prejudicial. In his argument to the jury the chief deputy district attorney stated as follows: "To me the greatest compliment that has ever been paid to the personnel of San Quentin prison is that these men, those 10 or 12 guards who came to the projection room and saw their fellow officer there with his head bashed in, and in a pool of blood and with these two characters standing over him with their blood drenched clothing—the miracle is they didn't beat them to a pulp. That is what they deserved and that is what you would have expected to happen." Upon objection and before any admonition from the court, the remark was withdrawn by the chief deputy district attorney and the jury asked by him to disregard it. He went on to explain to the jury that he was attempting to help them to better understand the emotional conditions under which the defendants were apprehended.

The same prosecutor, in commenting on a letter in which the defendant Rogers stated that he was filled with hate for the human race, directed the attention of the jury to Rogers and stated: "If you will look at him now and imagine him with two horns sticking out of his head—you couldn't picture a more malignant person or a person more filled with malice and hatred for everything he comes into contact with." At another point he stated: "There are a few who are so vicious and so depraved and so far beyond rehabilitation, so incorrigible it scares the mind of an ordinary person to ever appreciate such people can exist and be called human beings." And, ". . . either Wiget or Rogers got hold of the small knife and shoved it into Burwell's back. Sometimes I hope it was Mr. Wiget who did it, as his last act." Other remarks assigned as unduly prejudicial referred to the defendants as "depraved," "criminal," "murderers," and expressed the opinion that society's only solution of the problem they create was to impose the death penalty.

It must be realized that the defendants, by their own admissions, had embarked upon a particularly vicious and brutal series of attacks resulting in the two homicides and two other uncalled for deadly assaults. They were incarcerated in prison at that time for crimes of violence.

The true character of the defendants was, from the evidence, so overwhelming that it is reasonable to assume that the jurors did not have to be informed of it. While the argument of the prosecutor now condemned by counsel for the defendants was intemperate and improper, it cannot be said that when made in the exigencies of trial and in contest with able opposing counsel a miscarriage of justice has resulted. Statements of a similar nature have been held not to constitute grounds for reversal in other cases. (See *People* v. *Kromphold,* 172 Cal. 512, 522 [157 P. 599]; *People* v. *Glaze,* 139 Cal. 154, 159 [72 P. 965]; *People* v. *Wheeler,* 65 Cal. 77 [2 P. 892]; *People* v. *Amaya,* 40 Cal.2d 70, 79 [251 P.2d 324]; *People* v. *Billings,* 34 Cal.App. 549, 558 [168 P. 396]; *People* v. *Stein,* 23 Cal.App. 108, 118 [137 P. 271].)

Finally it is contended by the defendant Burwell, a Negro, that members of his race were systematically and purposefully excluded from the grand jury which indicted him, and that he was therefore deprived of his constitutional right to a fair trial. A motion to quash the indictment on that ground was made in advance of trial and a hearing was held at which evidence was taken. The motion was denied.

It appears that prior to 1942 the Negro population in Marin County was negligible but had increased during the war years. In 1930 it represented less than seven-tenths of 1 per cent. In 1940 it was almost 1 per cent, and in 1950 it was between 2 and 3 per cent. The county clerk testified that he knew of one Negro who had been on the grand jury list but had exercised a personal privilege and had declined to serve. It is conceded that many Negroes had served on Marin County petit juries and Burwell makes no attack on the ground that members of his race were improperly excluded from the jury that convicted him. In opposition to the motion to quash, the People called as a witness the Honorable Edward I. Butler, a retired judge of the Superior Court of Marin County, who had impaneled the grand juries during the years in question. (1942-1952.) He testified that he selected members of the grand jury "as well as I could and to get as nearly as possible a cross-section of the county." He stated that he was not prejudiced against Negroes and cited *James* v. *Marinship Corp.* (1944), 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900] as indicative thereof. In that case as trial judge he rendered judgment in favor of a Negro who sought to compel a labor union in Marin County to grant him equal rights.

The defendant relied on cases arising generally in the South to the effect that purposeful and systematic exclusion of Negroes from a grand jury constitutes a violation of constitutional rights, and that the indictment cannot stand when sufficiently challenged. (*Hill* v. *Texas* (1942), 316 U.S. 400 [62 S.Ct. 1159, 86 L.Ed. 1559]; *Smith* v. *Texas* (1940), 311 U.S. 128 [61 S.Ct. 164, 85 L.Ed. 84]; *Norris* v. *Alabama* (1935), 294 U.S. 587 [55 S.Ct. 579, 79 L.Ed. 1074]; *Patton* v. *Mississippi* (1947), 332 U.S. 463 [68 S.Ct. 184, 92 L.Ed. 76, 1 A.L.R.2d 1286].)

In *Hill* v. *Texas, supra,* approximately 15 per cent of the population were Negroes. In 16 years no Negro had been called to serve on a grand jury, and the jury commissioners who selected grand juries indicated that they affirmatively refrained from selecting citizens of the Negro race. In *Norris* v. *Alabama, supra,* 13 per cent of the population eligible to vote were of the Negro race. Within the memory of witnesses no Negro had ever served on a grand or petit jury. A jury commissioner testified that jury panels were selected from lists of names on which those of the Negro race were indicated by the notation "Col." In *Patton* v. *Mississippi, supra,* 35 per cent of the population were Negroes and no Negro had been on a grand or petit jury venire for more than 30 years. In *Smith* v. *Texas, supra,* Negroes constituted 20 per cent of the population but only five had served on grand juries in an eight-year period, and the jury commissioner's testimony indicated that Negroes had been systematically excluded. In *People* v. *Hines,* 12 Cal.2d 535 [86 P.2d 92], it was stipulated that there had been a systematic exclusion of Negroes from venires and from juries for a long period of years, and that 7 per cent of the entire population of the county were qualified Negro voters.

There is no question as to the rule of law applicable. The only question in the present case is whether there was in fact an unlawful exclusion of the members of Burwell's race from grand jury service in Marin County. The testimony of Judge Butler was in support of the conclusion of the trial court that there had been no purposeful and systematic exclusion of members of the defendant Burwell's race from grand jury panels in Marin County prior to and at the time of the indictment. Other evidence that during a period of 10 years prior to the trial Negroes had been placed on both petit and grand jury panels was in further support of the trial court's conclusion.

A diligent examination of the voluminous record reveals without exception that the court acted fairly and impartially throughout the trial and at no time abused its discretion in conducting the protracted judicial proceeding. The evidence is overwhelming in support of the verdicts. No error on the part of the trial court has been shown and misconduct on the part of the prosecutors, although subject to criticism, has not resulted in a miscarriage of justice.

The judgments and the orders denying motions for a new trial are affirmed.

Gibson, C. J., Edmonds, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Appellants' petitions for a rehearing were denied March 3, 1955.